(No. 12984.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FRANK LOWHONE, Plaintiff in Error.

*Opinion filed February 18, 1920—Rehearing denied April 8, 1920.*

1. CRIMINAL LAW—*when motive is not material.* The prosecution is not bound to prove a motive for the crime charged where guilt is clearly established, but where the guilt is not clearly established motive becomes material.

2. SAME—*when defendant who is partially insane is responsible for crime.* In a case of partial insanity, such as paranoia, the afflicted person, to be responsible for a crime, must not only be capable of distinguishing between right and wrong, but he must also be mentally capable of choosing either to do or not to do the act constituting the crime and of governing his conduct in accordance with such choice.

3. SAME—*when unlawful act is result of insane impulse and not of criminal intent.* An insane impulse which may impel a man to commit an unlawful act without being guilty of a criminal intent

must be the result not merely of an inflamed passion but of an insane delusion which is due to a diseased mind, and which, without any provocation, so overpowers his reason as to render him incapable of refraining from committing the act.

4. SAME—*when instructions as to defense of insanity are misleading.* In a murder trial, where the defense is partial insanity of the type known as paranoia, instructions which make the sole test of the accused's responsibility his ability to distinguish right from wrong are misleading and prejudicial, even though there is one instruction given which is substantially correct and includes the element of mental ability to choose between right and wrong and of governing his conduct accordingly. (*Dunn* v. *People,* 109 Ill. 635, explained.)

THOMPSON and CARTWRIGHT, JJ., dissenting.

WRIT OF ERROR to the Circuit Court of White county; the Hon. JULIUS C. KERN, Judge, presiding.

F. M. PARISH, and IVAN A. ELLIOTT, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, JOE A. PEARCE, State's Attorney, and ALBERT D. RODENBERG, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error, Frank Lowhone, shot and killed Mack Nottingham April 4, 1919, in the city of Carmi, White county, Illinois. He was indicted for murder, tried, found guilty and sentenced to death. This writ of error is sued out by him to review the judgment.

The killing is admitted. The defense was insanity. The plaintiff in error had lived in Carmi since he was about nine or ten years old. Before he went to Carmi he had lived with his mother on a farm near there. He was a laborer and worked at various kinds of employment and for various persons for a livelihood. In October, 1918, he received employment at a coal mine at Benton, Franklin county, Illi-

nois, where he worked until about the first of April, 1919. The day before the homicide he with his family returned to Carmi. He had gone to Carmi without his family about two or three days before but returned to Benton with his wife, who came after him, and the family all went to Carmi April 3. Plaintiff in error and deceased had been acquaintances and friends some years. They had worked together for the same employer and so far as disclosed by the record there had never been any trouble or disagreement between them. John Bachman, an acquaintance of both men, testified that about an hour before the homicide he met the plaintiff in error on the street and they engaged in a friendly chat, each inquiring of the other how he was employed. Bachman said he had been baling hay and plaintiff in error said he had been working at a coal mine. While they were engaged in conversation Nottingham joined them. He and plaintiff in error shook hands, and plaintiff in error asked Nottingham whether he was still working at baling straw, which was a job they had worked together on about two years before. Nottingham replied he had quit that job a little while after plaintiff in error quit it and had since been working for a farmer, George Chapman. Plaintiff in error said he could not work for a better man, to which Nottingham agreed. After some further friendly talk the plaintiff in error said he was going across the river, and he left Bachman and Nottingham, who continued talking some ten or fifteen minutes, then walked to the next street corner together, where they separated. Very shortly afterwards Nottingham was sitting on a bench in front of Hubele's store. The bench was at the outer edge of the sidewalk and he sat facing the store.

H. C. Fulkerson testified he was about 200 yards from the store and heard a shot fired. On looking in that direction he saw Nottingham rise up in a protecting position and start running, plaintiff in error following and shooting. Two shots were fired in front of the store. They ran

around the store toward the rear and plaintiff in error con-
tinued shooting. Altogether four or five shots were fired.
Witness saw plaintiff in error returning toward the front
of the store, re-loading his revolver. The street in front
of Hubele's store runs east and west. Oscar A. Nelson
testified he came from a short distance east of the store
past it. Nottingham was sitting on the bench in front of
the store. While witness was walking in that direction he
saw plaintiff in error probably fifty yards behind him, go-
ing in the same direction. After witness had passed beyond
the Hubele store he heard a shot, and turning around saw
Nottingham running and plaintiff in error after him, shoot-
ing. They passed out of witness' sight and he heard two
more shots. He saw plaintiff in error come back towards
the court house, which was about fifty yards west of Hu-
bele's store, and meet the sheriff. Witness understood the
sheriff to ask if he hit the person he was shooting at, and
plaintiff in error to answer that he did not know but thought
he did; that he was shooting at him. He appeared to be
greatly excited.

Cyril Endicott was in front of the court house, about
fifty yards from Hubele's store, when the shooting began.
When he heard the report of a gun he looked and saw the
plaintiff in error about the middle of the sidewalk. Not-
tingham was running sideways from him and another shot
or two were fired. Witness saw plaintiff in error come
back from the direction the parties had run and start to
re-load his gun.

Frank Martin was in the court house when he heard
three shots fired. As he went to the front door he heard
two more shots. Looking east he saw plaintiff in error
walking west, with his head down, re-loading his gun. Wit-
ness and the sheriff reached him about the same time. The
plaintiff in error handed his gun to the sheriff and said,
"Here it is; I meant to give myself up." Witness asked
him what was the matter, and he replied, "Oh! they have

been running over me around here; trying to run me out of town and one thing and another." Witness asked plaintiff in error, "Did you kill him?" and he answered, "I hope I did, the damn son of a bitch." Witness then asked who it was, and he said Nottingham. He seemed excited.

Thomas Brown, whose attention was attracted by the report of a gun, gave about the same account of it as other witnesses.

Charles Gibbs, the sheriff, testified he was in the back yard of the court house when he heard a shot fired and in a little while two more. He went around the court house and met plaintiff in error about thirty feet east of it. He had a revolver in his hand and it looked like he was reloading it. Witness took the gun and inquired what the trouble was but could not remember his answer. Witness asked at whom he was shooting, and he said Nottingham. Witness inquired if he hit him, and he replied he did not know; that he hoped he had. The sheriff put him in jail, and afterwards, when he took his meals to him, plaintiff in error inquired how Nottingham was getting along and how many times he hit him. Witness told him Nottingham was hit three times: once in the breast, once in the hand and once in the thumb. Plaintiff in error said he "guessed the shot that went through his hand went into his breast, as he threw his hands up when he was shot." Nottingham died the next day after the shooting from the effects of the wound in the breast.

No testimony was offered on behalf of plaintiff in error except on the question of his sanity. His brother, Tom Lowhone, testified he was a barber and lived in Fairfield and was working there during October, 1918. On the 26th of that month he received a long distance telephone call from his sister, Estella, who was married and lived in McLeansboro. He went there the next day, and at the depot there met plaintiff in error and asked him what was wanted. Plaintiff in error said he would tell him, and they went into

the toilet at the station. Plaintiff in error asked witness if
he was going to Carmi, and on being answered in the af-
firmative he told witness not to go there that day as they
would get him sure; that they were waiting there for him.
Witness told him no one was waiting for him and inquired
what was the matter with plaintiff in error, and he said,
"You will see; if you go to Carmi to-day they will get
you sure." He wanted to know when he could see witness,
and was told he could see him anytime. He said he would
go home with his brother, but on being invited to do so
refused, and said, "They will meet me and they will kill
me if I go back over there." His brother inquired whom he
meant, and he said, "The gang around there." His brother
told him he was dreaming,—that there was no gang around
there. He finally agreed to meet his brother next day at
Enfield. Tom came to Enfield on the train next day and
the plaintiff in error met him and together they went on to
Carmi, where they took the train for Mt. Carmel. Tom tes-
tified that on the trip plaintiff in error would talk silly and
say, "They have got it in for me, and somebody has told
them about us coming up on the train." He would talk
foolish and sit and twist his fingers. When they left the
train at Mt. Carmel he asked his brother a number of times
if he didn't think they had telephoned over there and were
after him, and his brother assured him no one was after
him and asked him to keep quiet. They went from Mt. Car-
mel to Fairfield, and plaintiff in error sat in the shop where
his brother worked until supper time, when they went to-
gether to supper. After the shop was closed in the even-
ing they went to see about getting plaintiff in error a job
in a laundry. They then went to the hotel where Tom
boarded and went to bed. Some time after midnight plain-
tiff in error woke his brother up and said, "Don't you hear
them around this window? Don't you hear them talking?"
His brother tried to quiet him and get him to go to sleep.
Later in the night plaintiff in error woke his brother again,

and the brother got up, opened the door and convinced him there was nobody there. After breakfast they went together to the barber shop and about ten o'clock the plaintiff in error said he was going to leave there. His brother advised him to stay and see about getting a job, but plaintiff in error said somebody had telephoned there about him and he was going to leave; that he wanted to go to Benton. His brother bought a ticket for him to Mt. Vernon and told him to take a hack at the station there and drive to the Chicago and Eastern Illinois railroad station. He left Fairfield and his brother did not see him again until after the homicide. On the train on the way to Fairfield plaintiff in error's brother asked him what people had it in for him, and he said the people in Carmi. His brother assured him he was mistaken, and plaintiff in error said they had it in for both of them over an election; that they were going to have another election soon and they had it in for him. The witness said he did not know the condition of his brother in his early days, but about eight or ten years ago the plaintiff in error one night about nine o'clock was coughing, foaming at the mouth, raving and wild and witness and an older brother tied him. Witness testified that it was his opinion from his brother's talk, acts and looks that he was insane.

Estella Stevenson, a sister of plaintiff in error, testified she lived in McLeansboro. Some time in October, 1918, plaintiff in error came to her house one night. It was Friday night and he left on Monday morning. She testified he did not look right, and she inquired what was the matter. He said he wanted to go to Fairfield to see his brother Tom and try to get work there; that they had it in for him at Carmi. She inquired whom he meant, and he said, "Oh! just the bunch." She told him he was mistaken and inquired what he thought they had it in for him about, and he said, "Oh! just the bunch of politicians down there; you know how they are." She told him it was imagination

and got him to go to bed. She said she could hear him "coughing and wrestling" all night long. Next morning he began his foolish talk again and said he wanted to see Tom, and became so wild that his sister promised to call Tom by telephone and ask him to come down. She called him, which seemed to pacify plaintiff in error. The crazy spells were not continuous. He would be all right for an hour or two then fly off again if he would hear a noise, and say, "What is that? They are after me!" Tom came on Sunday but did not come to witness' house and she did not see him that time. Plaintiff in error left Monday morning and she did not see him again until after the homicide. From his actions and conversations while at witness' house it was her opinion that at times he was insane and at other times he was all right. He would talk with good sense about his work, his mother and other things, but if he heard a noise he thought someone was coming to get him.

Lucretia Lowhone, mother of plaintiff in error, testified they lived in the country, about five miles from Carmi, until he was about nine or ten years old, when they moved there. Until he was about a year old he was very sickly, then became about normal until he was four years old, after which he had "spells" off and on when corrected or when he became excited. The last one was in 1892, except one time when he came in and acted like he had been drinking and his brothers tied him. A doctor was called and prescribed medicine, which he took and got better. He was sick two or three days afterwards. He stayed at witness' house the night before the homicide. She testified he was in a very restless condition and kept her awake. He would get up and go out doors every little while. During the night she heard two pistol shots. She got up and went to his room and asked what was the matter with him, and he said, "The pistol has been loaded so long I just unloaded it; I ain't going to hurt anybody." She believed him insane in the early part of April, 1919.

Mrs. Dell Dart, another sister of the plaintiff in error, about eleven years older than he, lived in Maunie, Illinois. She testified she lived at home till she was twenty-five. In his early childhood plaintiff in error had fits until he was about eleven years old. After that time witness was not at home much. When he had fits his eyes would be wide open, his muscles would harden and stiffen and he would seem almost lifeless. Witness could not say whether he was having chills when he had those spells. He did have chills, which were then a very common thing in that country, and when his fever was high he would be delirious.

Livesay, a coal miner, knew plaintiff in error while he worked at the mine in Benton from about November 1 to April 1. His business was pinching cars down to the place of loading. He said the people of Carmi had it in for him; that they were jealous because he could get a job and others couldn't; that he and his brother Tom had made public speeches against fellows who had been living off of the county; that they were sore at him and he had to leave there. These conversations occurred several times, and he heard the same kind of conversations between plaintiff in error and other employees at the mine. He would also ask whether the men at the mine had it in for him. He said he thought the fellows he was working with had it in for him and before he would have trouble he would leave. At times he looked wild out of his eyes. Witness believed him insane. He doubted his ability to know the difference between right and wrong. He didn't know whether he was capable of knowing it was wrong to shoot a man.

Oscar Roper, foreman of the day shift at the mine where plaintiff in error worked, testified plaintiff in error worked on the night shift. Witness had conversations with him. He would sometimes ask witness a question, walk away and then come back and ask the same question again. He would repeat this as many as three or four times the same evening. He told witness many times he came from Carmi be-

cause he couldn't live there,—they were all against him. From his looks, talk and actions he was not, in the opinion of witness, a sane man. One time he told witness he had been in the penitentiary, and said he had shot a colored fellow in Carmi. Witness did not believe him but did not know whether the statement was true. He also told the witness he thought the miners had it in for him and he was going to quit that job and leave. Most he would talk about was that somebody in Carmi was going to do him harm. He became a member of the miners' union and as far as witness knew did his work there. Witness thought he was able to know the difference between right and wrong but did not know whether he knew it was wrong to shoot a man at times when he looked wild. Witness also thought he would know that it was wrong to kill a man without any cause.

E. C. Britton worked at the mine with plaintiff in error on the same shift. Britton was the foreman. He testified the miners got their water in a field fifty or seventy yards away. He would sometimes send plaintiff in error for the water. He would be gone probably half an hour and someone would go after him. When spoken to about having been gone so long he would say that the first thing he knew he was up there by a thorn tree and just circled around before he could find the well. The same thing occurred repeatedly. He told the witness the people at Carmi were down on him; that he had a place there, but the people did not want him to come back to it and were going to try to kill him. He repeated this many times. He would walk backwards and forwards on the track with his head down and seem in a deep study. Witness believed him insane. He spoke about shooting or killing a man. At times he did his work all right but was a little hard to make understand,—more so than anyone else who worked on witness' shift. Witness did not know whether at times he was able to know right from wrong. There were times

when he would have known it was wrong to shoot a man but there were times when witness thought he would not.

Thomas Cook worked at the mine with plaintiff in error and frequently had conversations with him. He said the people in Carmi had it in for him and that he had to leave there. He appeared to be afraid that they would do him harm. He would act strange at times, look wild and seem to be in a rage like a wild animal. Witness thought he was sane at times and insane at other times. He gave the same reason to the witness why the people at Carmi had it in for him that he had given other witnesses. Witness believed that at times his state of mind was such he would not know it was wrong to shoot a man.

Gilbert Shaw rode brakes while plaintiff in error pinched cars at the mine. Sometimes plaintiff in error rode brakes. Witness never talked with him very much, but there were times when he thought he was insane and at other times he was sane. Witness never talked with him at any time when he thought he would not know it was wrong to shoot a man without cause.

Theodore Biggs worked on the same shift with plaintiff in error at the mine. He told witness the people in Carmi were all against him; that he didn't want to stay there and had to come to Benton for work. He said the people at Carmi were jealous of him because he could get and hold a job when they could not. He told the witness he had killed a man once. He asked the witness whether he liked him or whether he had anything against him, and wanted to know if the witness would ever "hand him a package." Witness believed from his conduct and conversations he was insane. Two-thirds of the time he knew right from wrong, but there were times when the witness believed he would not know it was wrong to shoot a man.

Dr. Boyer, a physician and surgeon of twenty years' experience, heard all of the evidence relative to the sanity of plaintiff in error and expressed the opinion he was insane.

The doctor testified he never had any experience in an insane hospital and didn't claim to be an expert on insanity but said he thought he was capable of judging whether the plaintiff in error was insane or not.   He testified his insanity was of such a degree that at times he believed he would not know right from wrong; that it was a form of paranoia, and in such cases persons sometimes get things in their minds that cannot be gotten out and they finally reach a climax.   The doctor further testified he could not state definitely whether at the time plaintiff in error did the shooting he knew it was wrong to shoot Nottingham; that a man may be affected with paranoia and still be rational enough to plan to kill another, but whether plaintiff in error did the shooting in furtherance of a plan and was rational when he did it witness could not say, but it would be possible for him to do that.

Tom Lowhone testified that neither he nor plaintiff in error had ever made speeches in Carmi.   The statements made to witnesses about plaintiff in error having killed a negro are the only references to that matter in the record, and we do not know whether those statements were true or were the product of a diseased imagination.

In rebuttal, Fred L. Rudolph, deputy sheriff, testified he had known plaintiff in error intimately for six years and had been acquainted with him about ten years; that six or seven years ago witness lived on the Hanna farm, where the plaintiff in error worked helping to bale straw from 240 acres of land.   Witness talked with him almost every day and noticed his conduct, and he expressed the opinion that he was sane at that time and able to distinguish between right and wrong.   Witness had talked with him since the shooting and had some opportunity to observe his conduct, and he expressed the opinion that he was sane and able to distinguish between right and wrong.

Charles Gibbs, sheriff of White county, testified that he talked with plaintiff in error some on April 4, after the

homicide, and that he believed him able to distinguish between right and wrong. He had talked with him nearly every day since the homicide. A day or two after it occurred plaintiff in error asked witness how Nottingham was getting along and what the people around town thought about his case and asked witness if he thought they would hang him. Witness thought at the time the conversations occurred he was sane and able to distinguish between right and wrong.

Tom Campbell, janitor at the court house, testified that a few days after the homicide he had a conversation with plaintiff in error in the jail. He asked witness what the people thought about his case and if they weren't down on him pretty hard. Witness believed him sane and capable of distinguishing between right and wrong.

John Bachman testified to the meeting and conversation between him, plaintiff in error and Nottingham about an hour before the homicide and referred to in the first part of this opinion, and said in his opinion plaintiff in error was in his right mind and knew the difference between right and wrong.

Dr. Anderson testified he had practiced his profession since 1898, was six years managing officer of the Chester State Hospital for Criminal Insane and is now managing officer of the State Hospital for the Insane at Anna. He heard all the testimony in this case, and testified that, taking it all into consideration, he was of the opinion plaintiff in error was mentally defective without being insane, and witness believed him able to distinguish between right and wrong. The doctor further testified an individual affected with paranoia never loses consciousness; that the disease does not affect the mental faculties; that a man afflicted with that disease would be able to distinguish between right and wrong.

It is evident from the proof that plaintiff in error was not generally or entirely insane. Whatever insanity he ex-

hibited was of the partial order formerly called monomania, now denominated paranoia, which is defined to be progressive insanity. Medical authorities say it is more common in men than in women and usually begins between the ages of twenty-five and forty. It has three recognized stages. The first stage is one of mild depression or hypochondria. The second is the persecutory stage, when the afflicted individual becomes possessed of the belief or delusion that he has enemies who are conspiring to injure him and deprive him of his rights and privileges, and these delusions sometimes drive him to appeal for help to government or judicial authorities and sometimes to himself wreak vengeance on one or more of his supposed enemies. In the second stage of the disease the individual occasionally has lapses of self-control, but for a greater portion of the time may be capable of restraining his inclinations to violence and destruction. The disease is regarded by the medical profession as incurable. One so afflicted may, if cared for, live to an advanced age. On other subjects than the delusions of the afflicted individual he may appear entirely normal and sane and by his acts and conversation show a proper recognition of his relations with and duties toward his fellow man. The acts and conversations of plaintiff in error testified to by a large number of witnesses from October, 1918, up to the time of the homicide are characteristic of a typical case of paranoia in the second or persecutory stage. Dr. Anderson, who was a witness for the prosecution and heard all the testimony, expressed the opinion that plaintiff in error was mentally defective but not insane, and he believed him capable of distinguishing between right and wrong. A paranoiac is, according to the medical authorities, capable of distinguishing generally between right and wrong and know and appreciate the effect and consequences of his acts, but there are times when, affected by his delusions, he either is incapable of distinguishing right from wrong or is incapable of controlling and restraining the im-

pulse to do a criminal act. It is not possible to know absolutely what condition of mind of plaintiff in error impelled or caused him to take the life of Nottingham. We can only judge of that from all the evidence and surrounding circumstances attending the homicide. The record does not show, and it is not claimed, there was any enmity between the two men or that they had ever had any trouble or disagreement. On the contrary, they appear to have been friends. At one time they had worked together for a considerable time on the same job and were well acquainted with each other. Less than an hour before the homicide they met, shook hands and conversed about what each had been doing since they last met. They parted in a friendly manner, and within an hour afterwards plaintiff in error found Nottingham sitting on a bench on the outer edge of the sidewalk and without a word spoken between them, so far as the record discloses, he opened a murderous fire on him. He appears to have been so determined to take the life of an innocent man who had never harmed or injured him that he followed his victim as he tried to escape and continued shooting at him. Immediately after his deadly work he said he hoped he had killed him and called him a vile name. It seems strange, if he was in control of his faculties, how he became possessed of such passion and vindictiveness against a man with whom he was on terms of friendship. It seems hard to believe that a man in full control of his mental faculties would ruthlessly, without any provocation, shoot his friend to death and then simulate such passion after the act. The witnesses testified he appeared at the time to be greatly excited. Deceased had done nothing to excite him. They had no quarrel or argument before the shooting. We do not overlook the rule of law that the prosecution is not bound to prove a motive for the crime. Motive is immaterial where guilt is clearly established, but where it is not clearly established motive becomes material. Here the proof on the part of the People

established the killing under circumstances that would make it murder, and the defense sought to excuse it on the ground that plaintiff in error was insane at the time. Many witnesses were asked whether in their opinion he was capable of distinguishing between right and wrong. Some answered they believed he was not, some would not express a definite opinion and some testified they believed he was.

The court gave on behalf of the prosecution the three following instructions, not numbered in the abstract but which for convenience we will designate as Nos. 1, 2 and 3:

"The court instructs the jury that if you believe from the evidence, beyond a reasonable doubt, that at the time of committing the alleged acts the defendant was able to distinguish right from wrong, then you cannot acquit on the grounds of insanity.

"The court instructs the jury that if you believe from the evidence, beyond a reasonable doubt, that the defendant committed the crime in manner and form as charged in the indictment and at the time of committing such act was able to distinguish right from wrong, you may find him guilty.

"The court instructs the jury that if from all the evidence in the case you believe, beyond a reasonable doubt, that the defendant committed the crime of which he is accused, in manner and form as charged in the indictment, and that at the time of the commission of such crime the defendant knew that it was wrong to commit such crime and was mentally capable of choosing either to do or not to do the acts constituting such crime and of governing his conduct in accordance with such choice, then it is your duty, under the law, to find him guilty, even though you should believe from the evidence that at the time of the commission of the crime he was not entirely and perfectly sane."

The early English rule, which was also followed by American courts, was, that to exempt one from punishment for crime on the ground that he was insane when the act was committed he must be totally deprived of understand-

ing and memory. . This court modified that rule in *Hopps* v. *People,* 31 Ill. 385, and said it was generally understood that there is a type of insanity or monomania of a less degree than total insanity, and, after referring to the early English and American decisions on the subject, the court announced the rule that insanity which will relieve the accused of the consequences of a criminal act must be of such a degree as to create an uncontrollable impulse to do the act charged, by overriding the reason and judgment and obliterating the sense of right and wrong as to the particular act done and depriving the accused of the power of choosing between them. That case was decided in 1863. Since then further advances have been made in knowledge on the subject of insanity, its various types and characteristics, and it is now recognized that there is a partial insanity known as paranoia; that a person whose mind is so diseased may be rational on most subjects but be a victim of insane delusions which render him either incapable of knowing a particular act is wrong, or if he can distinguish right from wrong as to a particular act he may be impelled to do the act by an irresistible impulse. The mere ability to distinguish right from wrong is not the correct test in cases of this character, where the defense is partial insanity of the type known as paranoia, but the accused must be capable of knowing right from wrong as to the particular act and he must also be capable of exercising the power to choose between them. Each of the instructions 1 and 2 in separate propositions states the sole test to be the ability, at the time of the act, to distinguish between right and wrong. They omit the necessary element, in cases of this character, that the accused must also be mentally capable of choosing either to do or not do the act and of governing his conduct in accordance with such choice. The third instruction states the rule with substantial accuracy, but we do not think this sufficient in this case to cure the error of the first and second instructions. How could the jury tell which of the instructions to

follow? These same instructions were held not to be erroneous in *Dunn* v. *People,* 109 Ill. 635, and on the authority of that case they were approved in *Hornish* v. *People,* 142 Ill. 620. The defense in the *Dunn case* was drunkenness, and it may well be that under the evidence in that case the instructions were not prejudicial, and the same may also be true in the *Hornish case,* but the first two instructions were erroneous under the evidence in this case, according to the rule laid down in the *Hopps case.* They are also inconsistent with the third instruction. Under the evidence developed in the trial of this case the first two instructions were erroneous and were of a character well calculated to mislead the jury, both in determining the guilt of plaintiff in error and fixing the punishment.

Under the state of this record we would not be justified in affirming the judgment, and it is therefore reversed and the cause remanded for a new trial.

*Reversed and remanded.*

THOMPSON and CARTWRIGHT, JJ., dissenting:

We cannot agree with the conclusion reached in the majority opinion. The defense is insanity. The evidence to support this defense comes from two sources: the family of defendant and the employees at the mines. An analysis of this evidence discloses its lack of convincing force. The testimony by members of the family shows that the defendant had "spells" in his infancy. These spells came on when he was suffering from a high fever or when he became angry. There is no claim that he has had any such spells since 1892, except on one occasion when he came home and caused a disturbance at the house and acted as if he had been drinking. This condition of defendant's health more than twenty-five years before the shooting, had, in our opinion, little, if any, bearing on his mental condition at that time and it has no bearing on his present mental condition. The other testimony of members of the fam-

ily relates to his complaints of "the people of Carmi having it in for him." All this testimony covers a period of time more than five months before the shooting and was no proof of insanity even at that time, unless there was proof in the record that his views on this subject were imaginary and had no foundation in fact. It is not at all unreasonable to assume from this record that his past conduct and manner of living justified a feeling of dislike for him by the people of Carmi. We have his own statement for the fact that he got drunk and raised a disturbance on the streets of Carmi on several occasions; that he killed a man at one time, and that he has served a term in the penitentiary. It is not to be expected that the people of a civilized community would have any great love or admiration for a man who has such a record, and especially for one who goes about boasting of his lawless acts. Members of the family express the opinion that the defendant was insane during the month of October, 1918, but they took no steps to have him treated for insanity. On the contrary, they sent him off to a strange community to work in the coal mines. The surrounding circumstances brand the evidence offered by the family as unreasonable and unworthy of belief, and the jury and trial court were fully warranted in placing little or no value on it. The employees at the mines testify that during the five months defendant worked there he lost no time and performed his work satisfactorily. He complained to these workmen that the people of Carmi were prejudiced against him, but at the same time he tells them of the disturbances he has raised in Carmi, and of his having previously killed a man, and of his having served a term in the penitentiary. Because of his boasting of his past record and of his complaint that "the people of Carmi had it in for him," some of the workmen at the mines express the opinion that the defendant did not at all times know right from wrong. Instead of this line of evidence being proof of insanity it is proof

to us of a mind of a braggart who commits criminal acts under slight provocation and then boasts of being a "bad" man. His conduct after the killing in question affords the strongest proof of this frame of mind. After killing Nottingham he re-loaded his gun, and if it had not been for the timely arrival of the sheriff it is a matter of speculation what would have occurred. To the sheriff and Frank Martin, an acquaintance of the defendant of twenty years' standing, defendant expressed the hope that he had "killed the damn son-of-a-bitch." Here is malice, plainly expressed. That the defendant realized at the time of the shooting the effect of his act is clearly demonstrated by the fact that he recognized the sheriff as the peace officer of the county and recognized the right of the sheriff to place him under arrest for the act he had done. If he was not able to know that it was wrong to shoot a man, then he would have not entertained any idea of surrendering himself to the sheriff and would not have quietly submitted to arrest when he met the sheriff. Whether or not he did honestly entertain the intention of surrendering himself to the sheriff can make no difference. The fact that he made the statement when he was caught shows that he fully understood the legal consequences of his act. The conduct and statements of the defendant at the time of the arrest are proof positive of his capacity to distinguish right from wrong and of a heart prompted to kill by evil and vicious motives. It is further shown that he realized all that was going on at the time he was shooting deceased, by his explanation that the wounds in the hands of deceased were caused by the fact that deceased raised his hands to protect his face and body from the bullets. He also realized that his punishment might be severe, and made inquiry as to the feeling of the people regarding his act and whether the jury would likely inflict the death penalty.

The commission of an unnatural and atrocious crime is not, in itself, evidence of insanity. (*People* v. *Spencer*, 264

Ill. 124.) Nor is it proof of absence of motive. We are convinced that the defendant is responsible for this murder. Where reason and judgment are not overcome but the person retains the power to choose between right and wrong as to the particular act done, he cannot escape responsibility for his acts under the plea of insanity. If at the time the crime is committed the defendant knows that it is wrong to commit such a crime and has the power of mind to choose either to do or not to do the act and of controlling his conduct in accordance with such choice, then he ought to be held responsible although he is not entirely and perfectly sane. Where a man knows that it is wrong to do a certain act and possesses the power of mind to do or not to do the act, it would be a dangerous doctrine to hold that such person should not be held responsible because he might not be regarded entirely and perfectly sane. *Dunn* v. *People,* 109 Ill. 635; *Dacey* v. *People,* 116 id. 555; *Hotema* v. *United States,* 186 U. S. 413.

The instructions condemned in the majority opinion lay down a rule of law long recognized as sound by text writers and by the courts of this and other States and by the Supreme Court of the United States and the courts of other countries. Established law should not be lightly set aside to reverse a conviction in a criminal case where the accused is plainly guilty. This court said in *Hopps* v. *People,* 31 Ill. 385, (the case relied upon in the majority opinion) that before there should be an acquittal on the ground of insanity it must appear from the evidence that the insanity was the efficient cause of the killing and that the defendant would not have done the killing but for the affection. It was further said there that the affection of insanity must be of such a degree as to create an uncontrollable impulse to do the act charged by overriding the reason and judgment and obliterating the sense of right and wrong as to the particular act done and depriving the accused of the power of choosing between them. In *Dunn* v. *People, su-*

*pra*, this court said: "Where a man knows it is wrong to do a certain act and possesses the power of mind to do or not to do the act, it would be a dangerous doctrine to hold that such person should not be held responsible because he might not be regarded entirely and perfectly sane." We regard the rule announced by the majority opinion dangerous, and think its application will permit the most dangerous of the criminal class to escape punishment for their heinous crimes. It is practically admitted that the instructions, taken as a series, state the correct rule of law, and this court in considering these very instructions has said that was sufficient. (*Dacey* v. *People, supra.*) This case was tried throughout by both sides on the theory that the defendant was responsible for this crime if he was able to distinguish right from wrong. There was only one act that was being considered by the jury, and that was the shooting of deceased. There is no force to the contention that the jury were possibly misled by these instructions in that they do not limit the test of mental capacity to a particular act. The instructions do limit the test to the shooting of deceased, and that is the only act the jury, or anyone else connected with this case, had in mind. These very instructions are approved with sound reasoning in *Dunn* v. *People, supra,* and again in *Hornish* v. *People,* 142 Ill. 620. The majority opinion does not hold that there is any doubt, reasonable or otherwise, of defendant's guilt. Without further reason the judgment is reversed because of a new and unsupported interpretation of the condemned instructions.

We are impressed, from an examination of the record, with the fact that the trial was conducted in an orderly and commendable manner. The conduct of the trial judge, the State's attorney and the jury was in every way above the slightest criticism. There was no error in the rulings of the court on the admission of evidence, and the jury were properly and fully instructed. "The court will interfere with a verdict of guilty only where there is clearly a rea-

sonable and well-founded doubt of the defendant's guilt. Whether the circumstances are such as to raise such reasonable doubt it is the special province of the jury to determine." (*People* v. *Dare,* 288 Ill. 182.) In *People* v. *Schoop,* 288 Ill. 44, it was said: "In *Gainey* v. *People,* 97 Ill. 270, this court said: 'The most important and useful function which the jury is required to perform is to determine on which side of a controversy the real truth lies where the testimony as to the material facts is directly in conflict and irreconcilable, and its conclusion in such case of necessity depends largely upon the credit to be given to the opposing witnesses, hence it is universally admitted to be the peculiar province of the jury to determine the credibility of the witnesses.' It is only when this court is able to say from a careful consideration of the whole testimony that there is clearly a reasonable and well-founded doubt of the guilt of the accused that it will interfere on the ground that the evidence does not support the verdict. This must necessarily always be the rule where the court has committed no error in its rulings, or where no such errors are complained of and no other improper conduct of the jury or of counsel is shown, as it was never the intention of the law that the court should usurp the province of the jury." And so have we held in *People* v. *Foster,* 288 Ill. 371, *People* v. *Binger,* 289 id. 582, *People* v. *Laures,* 289 id. 490, and many other cases.

The jury, after a consideration of all the evidence, have found that the defendant was not insane and that he was responsible in every respect for the crime which he committed. After such a finding any punishment less than the death penalty would not have been justified. The defendant has had a fair trial. The evidence fully justifies the verdict of the jury, and the judgment should be affirmed.