(No. 53173.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. KENNETH ALLEN, Appellant.

*Opinion filed January 20, 1984.—Rehearing denied March 30, 1984.*

RYAN, C.J., and UNDERWOOD, J., dissenting.

Robert Agostinelli, Deputy Defender, and Charles Hoffman and Verlin R.F. Meinz, Assistant Defenders, of the Office of the State Appellate Defender, of Ottawa, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark Rotert, Assistant Attorney General, of Chicago, and Michael E. Shabat and Richard B. Levy, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

Defendant, Kenneth Allen, was charged by information in the circuit court of Cook County with the murder of two Chicago police officers. Following a fitness hearing, at which a jury found him competent to stand trial, defendant, *pro se*, pleaded guilty. Pursuant to section 9—1(d) of the Criminal Code of 1961, the State requested a sentencing hearing to consider whether the death penalty should be imposed. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d).) At this hearing, defendant again proceeded *pro*

*se* and also waived his right to a jury determination of the issue. The trial court found that the necessary aggravating factors existed and that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. Defendant was sentenced to death. (See Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c).) A direct appeal to this court followed. Ill. Const. 1970, art. VI, sec. 4(b); 73 Ill. 2d R. 603.

The record reveals that on December 13, 1978, Bianca Smith summoned the police to a residence where she and defendant lived. Smith told police that she needed assistance and that defendant was armed. When police arrived, defendant displayed a rifle and demanded that they remove themselves from his property. Lieutenant Robert Hanley and Commander James B. Delaney attempted to calm the defendant, and after approximately 19 hours he surrendered. Defendant was then arrested and charged with aggravated assault and misdemeanor firearm violations.

The next day, while still in police custody, defendant's residence was searched pursuant to a warrant. The police confiscated seven firearms, along with over 1,000 rounds of ammunition. When defendant returned home, he discovered that the weapons were taken by the police and apparently became determined to seek revenge on the individuals responsible for the issuance and execution of the search warrant.

On March 3, 1979, defendant visited a locksmith and glazier shop. After asking some unusual questions of the shop's proprietor, defendant discovered that a .45-caliber bullet would not penetrate bullet proof glass, but that police cars were not equipped with such glass. Later that day, defendant observed police officers William Bosak and Roger Van Schaik as they effected a routine traffic stop. He parked his car next to the unoccupied police car, opened fire, and fatally wounded Bosak. Defendant

continued his attack upon Van Schaik, who returned the fire. When Van Schaik ran out of ammunition, defendant went to his car and retrieved a rifle. He fired at Van Schaik three times before the rifle malfunctioned. When the officer fell wounded, defendant took the service revolver from the body of Bosak and shot Van Schaik twice in the head at point-blank range, killing him instantly.

As other officers arrived on the scene, defendant returned to his car and sped away. After an extensive police chase, defendant was captured and arrested. A search of defendant's car revealed three firearms and a notebook. The notebook contained the names, addresses and vehicle license plate numbers of the judge, the investigator, and police officers who were involved in the December 14, 1978, search warrant.

Private counsel, Thomas Holum, was initially retained to represent defendant. However, due to defendant's indigency, he withdrew and public defenders Stuart Nudelman and Dale Coventry were appointed. Their motion, that defendant be taken to Cermak Hospital for observation and a behavorial clinic examination, was denied.

Private counsel JoAnne Wolfson and James Cutrone were later retained to represent defendant and the public defenders were allowed to withdraw. At arraignment, Wolfson and Cutrone appeared for defendant and entered a plea of not guilty. A week later, they moved that defendant be examined neurologically and psychologically, including a brain scan and an electroencephalogram (EEG). The court granted the motion; however, defendant refused to undergo the testing. Wolfson and Cutrone moved to withdraw, stating that they deemed the tests to be an integral part of the defense. The court granted the withdrawal and allowed defendant time to seek counsel. Nudelman was appointed during the interim.

On August 2, 1979, public defender Richard Kling appeared for defendant and informed the court that Nudelman was ill. At that time, defendant requested an interview with a lawyer from both the Chicago and Cook County bar associations. The court allowed the request and advised defendant that if he did not want the first attorney interviewed he could interview a second, but that he should not expect that he would be permitted to go through the entire Illinois bar. The court appointed bar association attorney Cornelius Toole after finding he was acceptable to defendant.

On September 21, 1979, the State announced that it was ready for trial. Toole reported that defendant wished to be tried first on the misdemeanor firearm charges. The State then dismissed those charges, and the murder case was continued on defendant's motion. On October 31, 1979, defendant moved to dismiss Toole, stating that he was angry because Toole "allowed" the misdemeanor charges to be dismissed. Without Toole's foreknowledge, defendant then moved to withdraw his plea of not guilty and enter a plea of guilty. The court refused defendant's requests and continued the case.

In November 1979, Toole informed the court that he had serious doubt regarding defendant's fitness to stand trial. Toole's motion for a behavorial clinic examination of defendant was granted. On November 21, the State reported that Dr. Gerson Kaplan, a psychiatrist, had examined defendant on November 20 and found him unfit to stand trial. The court then granted Toole's request for a hearing to determine defendant's fitness to stand trial. Defendant repeatedly objected to any proceedings regarding his fitness and refused to speak with Toole. Defendant insisted that the court accept his plea of guilty. The court, however, informed defendant that the plea would not be accepted until his fitness was determined. The court suggested to Toole that he should have

one of his associates conduct the fitness hearing since he might be called to testify.

On November 27, 1979, William O'Neal, an associate of Toole, appeared for defendant at the fitness hearing. Defendant objected to O'Neal's representation because of his association with Toole. Defendant's motions to proceed either *pro se* or *in absentia* were denied. Defendant then moved that the public defender be appointed. The court allowed O'Neal to withdraw and appointed public defenders Mariam Burke and Edward Ptacek. After a jury was selected, the fitness hearing commenced.

The State called Dr. Werner Tuteur, a psychiatrist, who testified that he examined defendant at the Cook County jail on November 22, 1979. Dr. Tuteur stated that defendant knew the charges pending against him and "discovered no mental condition which would prevent the defendant from assisting in his defense." Based upon the examination, it was Dr. Tuteur's opinion that defendant was fit for trial.

Correctional Officer Morris testified that on November 20, 1979, defendant locked himself in his cell and had to be forcibly taken to Dr. Kaplan's office for a psychological examination. Following this testimony, the State rested.

Dr. Kaplan was called as a court's witness. He testified that he examined defendant and determined that defendant was unfit to stand trial because he was unable to assist in his own defense due to a "paranoid state." Dr. Kaplan acknowledged that the examination was not conducted under optimum conditions because defendant had to be forcibly taken to his office.

A defense motion for a directed finding of unfitness was denied. The defense then presented public defenders Kling and Nudelman, who stated that, based upon their interaction with defendant, it was their opinion that

defendant was unable to cooperate with counsel in his own defense. Over defense counsel objection, defendant testified on his own behalf. He urged the jury to consider his conduct during the proceedings and to consider the "very credible" testimony of Dr. Tuteur. Defendant also stated that he was "fit to stand trial" and was "innocent of the charge of insanity." Closing arguments were made and both sides rested. The jury found that defendant was fit to stand trial. Attorneys Burke and Ptacek were allowed to withdraw and Toole resumed representation of defendant.

On December 3, 1979, defendant moved that Toole be discharged and that he be permitted to proceed *pro se*. The court advised defendant that self-representation in a murder case would be unwise. Defendant agreed and requested appointment of counsel other than Toole. The court informed defendant that another attorney would not be appointed. Thereafter, defendant persisted in his request to proceed *pro se*. The court, with Toole present, admonished defendant in accordance with Supreme Court Rule 401 (73 Ill. 2d R. 401) and, after it determined that the waiver of counsel was knowingly, intelligently, and voluntarily made, allowed dismissal of Toole. The court, however, requested that Toole stand by and advise defendant. Defendant then informed the court that he wished to plead guilty to both charges of murder. The court fully complied with Supreme Court Rule 402 (73 Ill. 2d R. 402) and accepted the plea after determining that there was a factual basis for the plea and the plea was voluntary.

The State requested that a sentencing hearing be held to consider whether the death penalty should be imposed. Defendant proceeded *pro se* and waived his right to a jury at that hearing. Defendant acknowledged that he shot two police officers with the intent to kill them. He indicated that he shot the officers because he thought

they were involved with the "police raid" at his house on December 13, 1978. He also stated that he was "in total agreement with the State in reference to imposing the death sentence." The court found that the State proved two statutory aggravating factors and that defendant was eligible for the death penalty. See Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(b)(1), (b)(3).

In the mitigation phase of the sentencing hearing, defendant offered no evidence. The State presented several witnesses who related the events of December 13, 1978, and December 14, 1978. In closing arguments, both the State and the defendant, *pro se,* recommended the death penalty. Finding no mitigating circumstances sufficient to preclude the death penalty, the court sentenced the defendant to death. See Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c).

On February 19, 1980, Deputy State Appellate Defender Ralph Ruebner informed this court that defendant did not wish to appeal his conviction or sentence. Instead, defendant desired that his execution take place on the date set by the trial court. On March 13, 1980, this court entered the following order:

"It has come to the attention of this court that Kenneth Allen, a person who has been sentenced to death by the circuit court of Cook County following his plea of guilty to two counts of murder, has expressed a desire that his execution take place upon the date fixed by the circuit court. He has purportedly stated that he does not wish to appeal his conviction and sentence. An appeal from a conviction and sentence of death is automatic, without the necessity of any action by the defendant or his counsel. Ill. Rev. Stat. 1977, ch. 38, par. 9—1(i); 73 Ill. 2d R. 606(a).

On the court's own motion, the State Appellate Defender is appointed counsel for defendant for the purpose of an appeal of the conviction and sentence. *The circuit court of Cook County is directed to permit the late filing*

*of a motion to withdraw the plea of guilty.*" (Emphasis added.) 79 Ill. 2d 471, 472.

Ruebner appeared for the defendant in the trial court on May 2, 1980. The court granted his motion for production of medical records regarding a head injury suffered by defendant in 1972. The records revealed that a portion of defendant's brain was removed during surgery for a depressed skull fracture. They also indicated that defendant suffered from seizures.

Thereafter, Ruebner moved to have the court appoint Dr. Kaplan to conduct clinical testing and a psychiatric examination of defendant. The motion stated that the purpose of the tests was to determine, *inter alia,* defendant's present sanity and his sanity at the time of the offense. Appended to the motion was Dr. Kaplan's affidavit in which he stated that the 1972 medical records, which he had seen for the first time on May 13, 1980, "raise a reasonable possibility that Kenneth Allen was suffering from a seizure condition" and from a "psychosis." Based upon his personal knowledge of defendant, the facts of this case, and defendant's medical history, it was Dr. Kaplan's opinion that defendant was "legally insane at the time of the offense." Dr. Kaplan also stated that psychological testing and psychiatric evaluations, including an EEG, were necessary to determine more definitely defendant's mental condition.

The State filed answers opposing both the appointment of Dr. Kaplan and any further testing. The court appointed Dr. Kaplan but limited the scope of that appointment to psychological and psychiatric examinations of defendant at the Stateville Penitentiary. In addition, the court stated:

"Now, if, after those examinations, the facilities there do not permit some particular examination that might be necessary, I think we can make some arrangements in the vicinity there to provide for it."

On June 24, 1980, by letter, Dr. Kaplan informed the

court that he examined defendant and, based upon this examination, it was his opinion that the defendant was legally insane at the time of the offense due to the mental condition of "paranoid state." Thereafter, Ruebner renewed his motion for further clinical and psychiatric examinations and requested that brain-wave tests be performed. The court then asked that Ruebner supply it with a medical opinion as to whether such tests were necessary. By letter on August 26, 1980, Dr. Kaplan informed the court and advised that there was a need for further tests. He recommended that an EEG, a brain scan and additional psychological examination be performed.

On October 15, 1980, Ruebner appeared and reiterated his position that additional tests were required. The State responded that further tests were not needed; however, it offered no evidence to support its conclusions or to rebut Dr. Kaplan's findings or recommendation for additional testing. Although the allegations of Ruebner's petition and supporting affidavit were uncontroverted, and contrary to its previous indication that any necessary examinations would be allowed, the court denied the motion for further testing. Ruebner then filed a motion to withdraw the plea of guilty, and that motion was also denied.

Defendant raises many issues on appeal. Because of the conclusion reached, we need address but one issue.

Defense counsel argues that the trial court erred in refusing to order additional testing to determine defendant's sanity at the time of the offense. He made an offer of proof that the testing would establish that defendant suffered from organic brain damage and would confirm Dr. Kaplan's diagnosis that defendant was paranoid and not legally responsible for his conduct on March 3, 1979. The State asserts that the 1972 medical records were not newly discovered and that defendant's failure to raise the defense of insanity constituted a waiver. The State also maintains that further neurological and psychological tests

were unnecessary because the head injury incurred by defendant in 1972 did not result in any permanent disorder. However, the State did not offer any basis in fact to support this conclusion.

Deeply rooted in our concept of liberty and due process is the requirement that an accused person must be of sound mind at the time of the perpetration of the offense, the trial, and imposition of sentence and execution. (See *People v. Anderson* (1964) 31 Ill. 2d 262, 264; *People v. Reeves* (1952), 412 Ill. 555, 561; see also *People v. Lego* (1965), 32 Ill. 2d 76, 78; *People v. Burson* (1957), 11 Ill. 2d 360, 368.) The petition for further testing and Dr. Kaplan's supporting affidavit indicated that defendant was not of sound mind at the time of the offense due to a "paranoid state" and "psychosis." Under Illinois law, a paranoid condition may form the basis for an insanity defense if that condition substantially impairs a defendant's ability to refrain from wrongful conduct. *People v. Moor* (1934), 355 Ill. 393, 399; *People v. Lowhone* (1920), 292 Ill. 32, 48.

It is true that insanity, as many other defenses, is a defense to be asserted at trial, and the responsibility of raising it rests on the defendant. (*People v. Reeves* (1952), 412 Ill. 555, 562.) However, the failure of a defendant to raise the issue will not always preclude him from later having the question considered. As stated by the court in *People v. Burson* (1957), 11 Ill. 2d 360, 370-71:

"We recognize that counsel for defendant did not present or argue this point; and that the general rule is that where a question is not raised or reserved in the trial court, or where, though raised in the lower court, it is not urged or argued on appeal, it will not be considered and will be deemed to have been waived. However, this is a rule of administration and not of jurisdiction or power, and it will not operate to deprive an accused of his constitutional rights of due process. 'The court may, as a matter of grace, in a case involving deprivation of life or liberty, take notice of errors appearing upon the

record which deprived the accused of substantial means of enjoying a fair and impartial trial, although no exceptions were preserved or the question is imperfectly presented.' ''

Moreover, the State's argument ignores the purpose of the order entered by this court on March 13, 1980. That order was designed to allow the Appellate Defender an opportunity to delve into the proceedings surrounding defendant's conviction and death sentence. Ruebner's motion for further testing was for the purpose of complying with our order and preparing a motion to withdraw the guilty plea.

The question of defendant's sanity at the time of the offense was first advanced by the Appellate Defender in this appeal. However, the record does show that approximately four of the nine attorneys who represented defendant tried to explore the possibility of raising the insanity defense. But, each time his counsel sought to gather evidence relating to that defense, defendant refused to allow them to do so. We note that, ordinarily, the consequences of a defendant's refusal to cooperate with his attorney will not serve as grounds for reversal. (See *People v. Myles* (1981), 86 Ill. 2d 260, 270-71, citing *People v. Solomon* (1962), 24 Ill. 2d 586, 589-90.) However, in this case, defendant's lack of cooperation with his attorneys imposed a substantial burden which, in effect, denied the trial court access to information relating to the factual basis for the guilty plea as well as the affirmative defense of insanity at the time of the offense. See *People v. Thomas* (1969), 43 Ill. 2d 328, 332.

A similar situation was before the court in *Costas v. People* (1956), 9 Ill. 2d 534. In that case, defendant was sentenced to 50 years' imprisonment upon a plea of guilty to an indictment for murder. On appeal, defendant moved to have the judgment of conviction vacated because certain facts regarding his state of mind at the time of the offense were not presented to the court when judgment was entered. Both of the attorneys who were appointed to repre-

sent defendant filed sworn affidavits that defendant was not mentally competent at the time the plea of guilty was entered and that defendant insisted that they secure the death penalty for him. An offer of proof made by defense counsel indicated that a psychiatrist would testify that, although defendant was able to cooperate with counsel, he was suffering from a mental illness at the time of the offense. The court held that, because the affidavits and offer of proof stood uncontested, justice required that a hearing be held on the petition to vacate the judgment.

In the instant case, the implications raised by the petition and supporting affidavit are not contradicted by any other evidence of record upon the remand. Moreover, the facts upon which the petition and supporting affidavit are based were not known to the trial judge when he permitted defendant to withdraw his plea of not guilty and enter a plea of guilty. As in *Costas*, "[i]f [the allegations] are true, and the conditions they indicate had been known to the trial judge, we assume that he would have refused to accept the plea of guilty until [defendant's] competence had been determined in the manner provided by statute." 9 Ill. 2d 534, 538-39.

As noted above, when this court entered the order of March 13, 1980, the purpose was to allow the Appellate Defender an opportunity to gather evidence in support of the motion to withdraw the guilty plea. Ruebner attempted to do so by investigating defendant's present state of mind and his state of mind at the time of the homicides. His petition for additional tests, along with the affidavit of Dr. Kaplan, clearly raise a sufficient question concerning defendant's sanity. The uncontested allegations of the petition and the supporting affidavit required the trial court to order further testing of defendant, as it had previously indicated that it would. We conclude, therefore, that the trial court's refusal to do so was error.

For the above-stated reasons, and because of the unu-

sual circumstances of this case, we find that the refusal of the circuit court of Cook County to grant the petition for further testing was error. Accordingly, the order of that court is reversed and the cause is remanded with directions to allow both parties to conduct a complete psychological, psychiatric and neurological examination of defendant. Thereafter, if the allegations of the petition are proved, the judgment on the plea of guilty must be vacated and a new trial ordered. If not proved, the original judgment and sentence shall be reinstated.

*Reversed and remanded,*
*with directions.*

CHIEF JUSTICE RYAN, dissenting:

I fear that the majority opinion establishes the proposition that one can enhance the probability of having his conviction reversed if he persists in obdurate obstructionist tactics. If there were the slightest chance that the defendant was not sane when the offense was committed, or that he was not competent at the time the guilty plea was entered, I would vote to reverse the conviction. Under the facts of this case, however, I find no reason to do other than to affirm the judgment of the trial court. As will be discussed later, the majority opinion omits any reference to that part of the record which supports the trial court's denial of the motion for further testing and the denial of the motion to withdraw the plea of guilty.

As noted in the majority opinion, the defendant was represented by numerous attorneys. The trial court was a model of patience in tolerating the defendant's conduct and exhibited the highest degree of judicious and humane consideration in assuring adequate legal representation for a very difficult defendant.

First, I must state that I do not understand the nature of the order that was entered by the majority in this case. Prior to defendant's plea of guilty, there had been a fitness

hearing, and the jury found the defendant fit to stand trial. He then entered his plea of guilty. Following the imposition of the death sentence, this court was informed that the defendant did not want to appeal. However, we held that an appeal from a death penalty is automatic and appointed the State Appellate Defender to represent the defendant. The circuit court was directed to permit the late filing of a motion to withdraw the plea of guilty.

Instead of filing a motion to withdraw the plea of guilty, Ralph Ruebner, Deputy State Appellate Defender, sought to generate evidence to the effect that the defendant was not sane at the time the offense was committed by filing the motion for further examination and testing. After the denial of this motion, Mr. Ruebner filed a motion to withdraw the plea of guilty which was denied.

The majority now reverses the circuit court of Cook County to allow both parties to conduct a complete psychological, psychiatric, and neurological examination of the defendant without setting aside the plea of guilty. Under the order of this court, it is only if the allegations of the petition filed by Mr. Ruebner are proved that the plea of guilty will be set aside and a new trial ordered. Presumably, if the allegations of the petition are not proved, the plea of guilty will not be vacated, and the sentence will stand. However, if the allegations of the petition are proved, the defense of insanity will have been established without the formality of a trial and without having vacated the plea of guilty. This appears to be placing the cart before the horse. If defendant was competent and voluntarily and knowingly entered a plea of guilty, as discussed later, he waived the defense of insanity.

The proper determination that should have been made is whether or not the trial court abused its discretion in failing to allow the defendant's motion to withdraw his plea of guilty. If the trial court did abuse its discretion, then the judgment should be reversed and the cause re-

manded with directions to permit the defendant to withdraw his guilty plea and for further proceedings.

I do not find that the trial court abused its discretion in denying the defendant's motions. I have noted that there had been a fitness hearing and that the jury found the defendant fit to stand trial. After the defendant stated he wanted to plead guilty, the court fully admonished him, as required by Supreme Court Rule 402 (87 Ill. 2d R. 402), and determined that the plea was voluntary. At the sentencing hearing, defendant acknowledged that he shot two police officers with the intent to kill them. He also stated that he shot them because he thought they were involved in the earlier police raid on his house. Thus, the defendant demonstrated he was well aware of, and fully understood, the nature of the charge against him.

Nothing presented to the trial court following our remand rebuts the prior finding that the defendant was fit to stand trial. Most of the information presented to the trial court by Mr. Ruebner relates to Dr. Kaplan's belief that the defendant was legally insane when the offense was committed. The tests to be applied in determining whether a defendant is competent to stand trial are entirely different from the test of insanity when it is used to relieve a defendant from criminal responsibility. (*People v. Hinton* (1973), 11 Ill. App. 3d 907, 909; *People v. Britton* (1970), 119 Ill. App. 2d 110, 113.) The defendant's motion to the trial court only vaguely referred to defendant's present sanity or fitness to stand trial. The primary thrust of the motion concerned the defendant's sanity at the time the offense was committed.

In addition to the finding that defendant was fit to stand trial, an extremely cautious and considerate trial judge admonished defendant as to the results of his plea of guilty and determined that the plea was voluntary. At the sentencing hearing, as noted, the defendant stated he shot the two policemen and intended to kill them and stated the

reason for doing so. Under these facts, I just cannot say that the trial court abused its discretion in denying the motion of the defendant for further mental examination and the motion to withdraw the defendant's plea of guilty.

As to the possible defense of insanity, to which Dr. Kaplan's affidavit alludes, since the defendant was found competent to stand trial and was fully admonished as to the effects of his plea of guilty, he waived the defense of insanity when he entered his guilty plea. The defense of insanity is an affirmative defense, and, unless it is raised at the time of trial, it is waived. *People v. Milligan* (1963), 28 Ill. 2d 203, 205.

In addition to the above reasons for affirming the judgment of the circuit court, as noted at the outset of this dissent, the majority opinion omits any reference to that part of the record which supports the trial court's denial of the motions presented by defense counsel Ruebner. As noted above, prior to filing the motion to withdraw the plea of guilty, Ruebner filed a motion for the production of the previously produced medical records of the Veterans' Administration Hospital concerning defendant's head injury and the resultant surgery, all of which had occurred approximately seven years prior to the commission of the crimes. The motion was granted and the records were produced, including a summary of the defendant's treatment for a skull fracture. According to the summary, the defendant had complained of headaches and "there was some question whether the patient had sensory seizures in the hospital." Surgery was performed. The majority opinion states "a portion of defendant's brain was removed during surgery for a depressed skull fracture." That statement makes it sound as though the surgery could be quite relevant and significant in any consideration of defendant's sanity. However, the hospital record, in describing the surgery, makes no mention of removing a part of defendant's brain. The hospital record simply states, in describing the

operation performed, "elevation of depressed skull fracture with removal of bone chips and debridement of wound."

The hospital record also states, "An EEG [was then] performed which *did not show* any seizure activity but the patient was prophylactically put on anti-seizure medication." (Emphasis added.) Ruebner showed all of the medical records to Dr. Kaplan, a psychiatrist who had testified at the competency hearing. In an affidavit prepared for the court, Dr. Kaplan set out his opinion that the records indicated a *possible* seizure condition in the defendant and the *possibility* that the defendant was thereby insane at the time of the offenses. Dr. Kaplan indicated that he felt an EEG and further psychiatric testing were necessary in order to determine the defendant's sanity at the time of the offenses as well as his fitness for execution. Citing Dr. Kaplan's affidavit and the medical records, Ruebner presented the trial court with the motion for further psychiatric and clinical testing of the defendant. A hearing on the motion was held on October 15, 1980.

As the majority opinion notes, Ruebner orally argued that the motion should be granted, saying that the records and Dr. Kaplan's affidavit substantiated the need for further testing to determine the defendant's sanity as of the present date and at the time of the offenses. The majority opinion acknowledges that the State argued against granting the motion, but states that Dr. Kaplan's affidavit was uncontroverted because the State offered "no evidence to support its conclusions or to rebut Dr. Kaplan's findings ***." (101 Ill. 2d at 33.) The majority's characterization overlooks the fact that the State's Attorney read the previously quoted summary of the defendant's treatment to the court to support the State's position that further testing was not necessary because the summary of treatment indicated *no seizure activity*. The State also pointed out that subsequent treatment charts contain notes that no seizure activity was present. The fact that the records had also

been available to earlier counsel was also noted.

The State pointed out that the medical records reveal that the defendant had been seen as an outpatient of the Veterans' Administration Hospital over a four-year period, after which he was no longer seen as an outpatient. The State called the court's attention to the fact that there is nothing in the records that would indicate that the defendant has any mental disease or defect, or that he has any problem as a consequence of his head injury and operation, nor is there any showing of seizure activity. It was further pointed out that these hospital records had been originally procured by defense counsel Wolfson and Cutrone and had been made available to defense counsel Toole, who had them in his file. Mr. Toole had full knowledge of the defendant's injury and the nature of the treatment and, during the course of the competency hearing, elected not to introduce testimony concerning these events. Finally, the State called the court's attention to the defendant's reasonably articulate conduct throughout the course of the competency hearing and also invited the court's consideration of the fact that the jury had an opportunity to observe the defendant's conduct during that hearing.

Thus, Dr. Kaplan's findings and recommendations for additional testing to do not stand unrebutted, as the majority opinion states. The medical records upon which the defendant now relies were not newly discovered evidence. They were known to defense counsel at the time of the competency hearing. The State used these records to rebut defense counsel Ruebner's assertion and Dr. Kaplan's recommendation that additional testing is needed.

The majority opinion acknowledges that ordinarily the consequences of a defendant's refusal to cooperate with his attorney will not serve as grounds for reversal, citing *People v. Myles* (1981), 86 Ill. 2d 260, 270-71, and *People v. Solomon* (1962), 24 Ill. 2d 586, 589-90. However, the majority states:

"[I]n this case defendant's lack of cooperation with his attorneys imposed a substantial burden which, in effect, denied the trial court access to information relating to the factual basis for the guilty plea as well as the affirmative defense of insanity at the time of the offense." (101 Ill. 2d at 35.)

However, in *People v. Solomon,* this court stated:

"Since defendant utterly refused to co-operate with his counsel, he cannot now be heard to complain that [the consequences] embarrassed his defense or prejudiced his rights." (*People v. Solomon* (1962), 24 Ill. 2d 586, 590.)

In my opinion, it is difficult to find much support for the majority's holding in the defendant's conduct in this case.

Even if I were to assume that the defendant did suffer from seizures after his surgery, I find it impossible to accept the defense's theory that he was insane at the time of the offenses. We have here a defendant who carefully researched the addresses of intended victims, visited a glazier's shop to determine the possibility of successfully attacking police officers in a squad car, and then launched his attack. Also, I have noted how the defendant acknowledged that he shot the officers with the intent to kill them and thereby avenge himself for his prior arrest. This series of acts is hardly consistent with the brief, albeit excruciating, nature of seizures. (See *The Nature of Aggression During Epileptic Seizures,* 305 New England Journal of Medicine 711 (Sept. 17, 1981); *People v. Speck* (1968), 41 Ill. 2d 177, 206.) Therefore, I believe that, whatever the medical records may show with regard to the defendant's past mental problems, it is impossible to credit the defense's theory that a seizure condition linked with the paranoia perceived by Dr. Kaplan to substantially impair the defendant's ability to refrain from wrongful conduct. The defendant's paranoia was presented to a jury by Dr. Kaplan at the competency hearing. The jury still found him competent to stand trial. I believe that even a history

of seizures would add no additional credibility to a claim of incompetence or insanity in this case.

It is for the above reasons I feel that the majority opinion was wrong in entering the order that it did remanding the case to the trial court for further proceedings. I must therefore dissent.

JUSTICE UNDERWOOD joins in this dissent.