(No. 13176.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ARTHUR E. HAENSEL, Plaintiff in Error.

*Opinion filed April 21, 1920.*

1. CRIMINAL LAW—*when a signed statement is admissible as a dying declaration.* A signed statement by the deceased as to who caused her death is admissible as a dying declaration after testimony by her attending physician that he told her she was going to die, that he read the statement to her and asked if she understood it, and that while her mental condition was good she signed the statement in his presence on the day of her death.

2. SAME—*instruction that proof of insanity must raise reasonable doubt of guilt is not erroneous.* Where insanity is the defense to a murder charge, an instruction which tells the jury that the proof of insanity, when taken with all the other evidence in the case, must be sufficiently strong to raise a reasonable doubt of the guilt of the accused before he can be acquitted on that ground, is not erroneous.

3. SAME—*when instruction defining malice aforethought is not erroneous as ignoring a defense.* Where the accused in a murder trial sets up the defenses of insanity and of alibi, an instruction defining malice aforethought but not attempting to direct a verdict is not erroneous as ignoring the defense of insanity, where other instructions announce the law applicable to that defense.

4. SAME—*judgment should be affirmed if an error complained of cannot affect result.* Where it can be said from the record that an error complained of cannot reasonably have affected the result of the trial the judgment of the trial court should be affirmed.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HUGO PAM, Judge, presiding.

RATHJE, WESEMANN, HINCKLEY & BARNARD, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, NOAH C. BAINUM, and WILLIAM C. CLAUSEN, (EDWARD E. WILSON, and LLOYD D. HETH, of counsel,) for the People.

293—3

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Plaintiff in error, Arthur E. Haensel, was convicted of the murder of his wife, Cecelia Haensel, and his punishment was fixed at death. The defense was insanity and alibi. He prosecutes this writ of error to reverse the judgment of the criminal court of Cook county on the grounds that the court erred in the admission of evidence and in the giving and refusing of instructions.

Plaintiff in error was born in Chicago and was twenty-eight years old at the time of the trial. When he was twelve years old he was placed in the Cook County Parental School on account of truancy and remained there two years. After this he worked about Chicago as a messenger boy and at other odd jobs. Later he went west and for two years worked on a farm with an uncle who lived near Salem, Oregon. In 1914 he enlisted in the United States army and went to the Philippine Islands, where he remained for two and a half years. In August, 1917, the transport on which he was a passenger was caught in a typhoon on the China sea and plaintiff in error was knocked unconscious by a blow on the head. Later in the same year he was receiving instructions in the use of hand grenades at Camp Fremont, California, and suffered an accident in practice which injured his spine. He later contracted a goiter and received treatment for three and a half months in a hospital for goiter and vertigo, after which he was honorably discharged from the army as unfit for overseas duty. He returned to Chicago. In the summer of 1918 he learned that he had syphilis and received medical treatment for this disease. In the fall of 1918 he met Cecelia Lenarczak, and on December 22 they were married. They lived together for eight days. On December 31, when he returned from work, he found a note from his wife advising him that she did not care to live with him any longer. He went to the home of her mother but did not find her there.

About a week later he returned, found his wife and had some discussion with her relative to her returning to his home. She refused to go with him because of the condition of his health and for a number of other reasons unimportant here. During the month of January they met several times at her mother's home and they went out together to picture shows and elsewhere. On two occasions during this month his mother-in-law observed him walking up and down in front of the house. He complained to the police that his wife and her mother were entertaining soldiers at the mother's house, and two detectives called one Sunday afternoon and found them and two soldiers in the house. They were sitting in the parlor playing the phonograph. Mrs. Lenarczak says they were old acquaintances who were home from the army and who had come up to see them that Sunday afternoon. According to the testimony of Mrs. Lenarczak, about 6:45 in the morning of February 4, 1919, Mrs. Haensel picked up her lunch and prepared to leave for her work. Just as she opened the door the plaintiff in error met her, stuck a gun against her chest and demanded some papers pertaining to his army service which he claimed his wife had taken with her when she left him. The women denied having any of his papers in the house but told him he might search for them. At this he struck Mrs. Lenarczak over the head with a pair of pliers which he held in his left hand, and as she ran back into a bed-room fired a shot which passed through the right side of her chest. As she ran into the front room of the house she heard two more shots fired. Plaintiff in error followed her to the front of the house and again struck her on the head with the pliers, knocking her down. He then left the house. Mrs. Lenarczak got up and went to the kitchen, where she found her daughter lying unconscious between the china closet and the stove. People were attracted by the shooting and the screaming of the women. The police came and took them to the Cook County Hos-

pital, where Mrs. Haensel signed a statement charging her husband with the shooting. Mrs. Haensel died from the effects of two gunshot wounds about 4:20 o'clock in the afternoon of the same day.

Plaintiff in error denies being at the home of his mother-in-law on the morning of February 4. According to his testimony he left his home about 6:50 o'clock in the morning, got on a street car and went down-town with the intention of going to work. He decided not to go to work and got off the street car and after walking about the street a while went to a barber shop and was shaved. After this he had breakfast at a lunch room and then went out on the street and watched some workmen laying new rails in the street car track. Later he went to a moving picture theater, where he spent about three-quarters of an hour. After leaving the theater he saw a copy of the *Daily News* and saw by the big head-lines that an ex-soldier had shot his wife and mother-in-law. He saw his own name in big letters and that the police were looking for him. He got a copy of the paper and according to his testimony first learned of the shooting by reading the article. He testified that he then determined to surrender himself to the police to prevent them from shooting him down at sight. After he surrendered himself to the police and identified himself he was taken to the hospital and taken into the presence of his wife. She recognized him and told the officers that he was the man who shot her and asked them to take him away for fear he would shoot her again. Plaintiff in error denied, in his wife's presence, that he had shot her. While he stood beside his wife's bed the wife's statement was read to him and he told her that the statement was not true.

It is first contended that the court erred in admitting as a dying declaration the following statement:

"I, Cecelia Haensel, being in my right mind and knowing that I am about to die, do hereby swear that my husband, Arthur Haensel, shot me this 4th day of February, 1919.

CECELIA HAENSEL."

Dr. Henry L. Orlov testified that he was house physician of the Cook County Hospital on February 4, 1919; that Mrs. Haensel was brought to the hospital about 8:10 in the morning and that he talked to her about 8:20, at which time she signed the above statement. He testified that the statement was in his handwriting and that he told her that she was going to die, and after reading the statement several times asked her if she understood it and cared to sign it. She did sign it and the physician signed as a witness. According to the physician her mental condition was good up to the time she signed the statement but her physical condition was serious. He found two wounds in her back, made by the entrance of bullets. One bullet came through the body and was visible under the skin in her right breast but the other bullet was not visible. When the statement was offered in evidence there was no objection to its admission and there was no cross-examination of the witness. We think, under the circumstances, the preliminary proof was sufficient to justify the admission of the declaration. (*People* v. *Buettner*, 233 Ill. 272; *People* v. *White*, 251 id. 67.) Regardless of whether or not the preliminary proof justified the admission of the declaration, the plaintiff in error could not have been prejudiced thereby, because the statement was re-affirmed by deceased in the presence of the plaintiff in error when he was brought into her presence at the hospital for identification.

It is contended by plaintiff in error that the court erred in the giving of People's instructions 6, 12 and 13. The objection is, that each of the instructions contains the statement "that a person is presumed to be sane until the contrary is shown." It is not contended that this is not the law, but it is urged that the repetition of this proposition, together with instruction No. 8, which told the jury "that in order to find the defendant not guilty on the ground of insanity such insanity must be so clearly proven as to raise a reasonable and well-founded doubt of the defendant's guilt

when the whole evidence is taken together," imposed upon
plaintiff in error the burden of proving the defense of in-
sanity.   We do not think these instructions are subject to
the construction placed upon them by plaintiff in error.   In-
struction No. 8 merely tells the jury that taking the defense
of insanity together with all the other evidence in the case,
the proof of insanity must be sufficiently strong to raise a
reasonable doubt of the guilt of the accused before he can
be acquitted on the ground of insanity.   In *Dacey* v. *Peo-
ple,* 116 Ill. 555, this court, in discussing an instruction to
which a similar objection was made, said: "Soundness of
mind is presumed if the defendant is not an idiot, lunatic
nor affected with insanity.   The first proposition of the
instruction, 'that the law presumes every man to be sane
until the contrary is shown,' is fundamental and unques-
tioned as being a sound proposition of law.   This instruction
defined the mental condition which will be held to exculpate
the party charged from punishment for an act which would
otherwise be criminal, and told the jury that such condition
must appear from the evidence before they would be war-
ranted in acquitting for that reason.   *   *   *   The pre-
sumption of sanity inheres at every stage of the trial until
insanity is made to appear by the evidence.   The law in
this State undoubtedly is that this legal presumption may be
overcome by evidence tending to prove insanity of the ac-
cused which is sufficient to raise a reasonable doubt of his
sanity at the time of the commission of the act for which
he is sought to be held accountable.   When that is done
the presumption of sanity ceases and the burden shifts to
the prosecution, and it is then required to prove his sanity,
as an element necessary to constitute crime, beyond a rea-
sonable doubt.   It is accurate to say that when the defense
of insanity is interposed and evidence offered tending to
sustain it, if the jury, after considering all of the evidence,
entertain a reasonable doubt of the sanity of the accused
at the time of the commission of the alleged offense he

must be acquitted. It is found, in practice, impossible, however, to embody in a single instruction every principle of law relating to the subject under consideration, and it is not necessary that the law in regard to the measure of proof required should be incorporated in each instruction. It will be sufficient if there is nothing in the particular instruction inconsistent with the principle pertaining thereto and other instructions in the series given correctly announce the rule." In *Jamison* v. *People,* 145 Ill. 357, we held that in order to overcome the presumption of sanity, evidence must be produced sufficient to raise at least a reasonable doubt of the defendant's sanity. We think, considering the instructions as a series, the jury were fully instructed as to their duty to acquit plaintiff in error if they entertained a reasonable doubt of his guilt by reason of insanity.

The plaintiff in error contends that People's instruction No. 4, given by the court, ignores the defense of insanity. That instruction told the jury that "the words 'malice aforethought' do not necessarily imply the lapse of a considerable time between the malicious intent to take life and the actual execution of that intent. Whether the design to effect death was formed on the instant or had been previously entertained is immaterial, for the malicious killing, if proven by the evidence beyond a reasonable doubt, in either case is murder under the laws of this State." Considering the inconsistent positions taken by plaintiff in error, it was difficult for the court to give instructions which could not be criticised on one or the other of the positions taken. Plaintiff in error insists that he was somewhere else than at the home of his mother-in-law when the shooting took place, and, therefore, that he had nothing to do with the shooting. On the other hand, the defense made by his counsel is that he was insane and therefore not responsible for the killing, which, by the hypothetical questions asked and by the instructions offered, they practically admit. We think, when considered with the other given

instructions, this instruction correctly states the law. If the instructions, when considered as a series, fairly present the law, this court will not reverse because the instruction objected to does not contain all the law of the case, unless the peculiar circumstances of the case render the instruction misleading. (*Henry* v. *People,* 198 Ill. 162.) This instruction does not purport to sum up the elements to warrant a verdict of guilty and does not direct a verdict. The rule laid down in this instruction was expressly limited to the meaning of the term "malice aforethought," and other instructions given to the jury announce the law applicable to the defense of insanity. This is all that is required. *People* v. *Phipps,* 268 Ill. 210.

Moreover, we think it can hardly be seriously contended that the plaintiff in error was suffering from that degree of insanity which will relieve one of responsibility for a criminal act. The only evidence offered on this subject was the testimony of his parents and sisters, to the effect that as a youngster he was dull and backward in school and that he was frequently guilty of truancy. They also noticed that after he returned from the army he was nervous and irritable. Plaintiff in error testified that this change was due to the two accidents he had in the military service and to the broken condition of his health. Dr. Stewart testified that he began treating plaintiff in error August 6, 1918, for syphilis, and that he gave him the last treatment on the 17th of December. He could not tell how long plaintiff in error had been suffering from this disease, but testified that the disease sometimes affects the brain and influences the mentality of the individual suffering from it. He testified that a disease of the brain known as paresis sometimes results from syphilis, but that he was not qualified to give the symptoms of paresis and was not prepared to say that the plaintiff in error had that disease. Dr. Smith testified that he had given special study to mental diseases and disorders but that he had made no examination of plaintiff in error.

To a hypothetical question embracing the life history of plaintiff in error hereinbefore set forth, he answered that from his training and experience he thought that plaintiff in error was suffering from a disease of the mind known as dementia præcox. He described dementia præcox as a disease that is evidenced by the deterioration of the mentality, commencing at an early age. He said that it evidences itself by delusions and hallucinations; that the subject usually imagines himself being persecuted and followed and that the public is prejudiced against him. It will be noted that the plaintiff in error exhibited none of the manifestations which Dr. Smith said are evidences of the disease. Dr. Krohn testified on behalf of the People that for thirty years he had made a specialty of nervous and mental diseases; that he had examined a total of 21,000 cases; that he had spent six years in a psycopathic hospital and that for a year he had charge of all nervous and mental diseases at Camp Travis. He testified that he made a careful examination of plaintiff in error with respect to his mental and physical condition; that his examination disclosed no mental disease, no mental aberration, no insanity; that he found no disease of the nervous system; that there was nothing affecting the honesty and correctness of the action of his brain or nerves; that the tests of the various reflexes showed that the brain sent forth its impulses and received them properly; that there was no brain disease and no infection of syphilis as far as the brain disclosed by the eye reflexes, by the knee jerks and the various tests; that he examined his head to see if the head injury received while the plaintiff in error was on the transport had affected his brain and that the reflexes tested exactly alike on both sides, which indicated that there was no injury of the brain that would cause any disturbance; that considering the life history of the patient and the results of his examination he considered him mentally sound.

It is also contended that the court erred in giving three instructions for the People defining and limiting the term "reasonable doubt." Much of the instructions was devoted to explaining that a reasonable doubt must be reasonable and not unreasonable and that it must not be a variety of other things not within the meaning of the term "reasonable doubt." The giving of these instructions, however, was not reversible error. *People* v. *Moses,* 288 Ill. 281.

Some complaint is made of the action of the trial court in refusing to give one of the instructions offered by the defendant. The defendant offered thirty-nine instructions, of which the court gave eleven. The given instructions embodied all the law necessary for an understanding of the issues involved, and that is all that is required. We think, taking the instructions as a whole, they fully and fairly announce the rules of law applicable to the prosecution and the defense. An examination of the evidence in this record so clearly and conclusively establishes the guilt of the accused that the jury could not reasonably have arrived at any other verdict than one of guilty. Where it can be said from the record that an error complained of could not reasonably have affected the result of the trial the judgment of the trial court should be affirmed. *Lilly* v. *People,* 148 Ill. 467; *People* v. *Anderson,* 239 id. 168; *People* v. *Murphy,* 276 id. 304; *People* v. *Halpin,* 276 id. 363; *People* v. *Michael,* 280 id. 11.

From the careful examination of this record which the solemnity and importance of the results which follow our decision demand, we are convinced that the defendant has had a fair and impartial trial, and that the jury would not have been justified, under the evidence, in returning any other verdict than the one on which plaintiff in error was sentenced. The judgment of the criminal court of Cook county is therefore affirmed.

The clerk of this court is directed to enter an order fixing the period between nine o'clock in the forenoon and

four o'clock in the afternoon of June 11, 1920, as the time when the original sentence of death entered in the criminal court of Cook county shall be executed. A certified copy of such order shall be furnished by the clerk of this court to the sheriff of the county of Cook.

*Judgment affirmed.*