(No. 34152.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RICHARD DANIEL CARPENTER, Plaintiff in Error.

*Opinion filed March 20, 1957—Rehearing denied May 20, 1957.*

DANIEL C. AHERN, and KEVIN J. GILLOGLY, both of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, JOHN T. GALLAGHER, RUDOLPH L. JANEGA, and WILLIAM L. CARLIN, of counsel,) for the People.

Per CURIAM: After trial in the criminal court of Cook County, a jury found the defendant, Richard Daniel Carpenter, guilty of murder and fixed his punishment at death. Execution has been stayed pending writ of error proceedings in this court.

The sole defense to the crime alleged, the murder of a Chicago police officer, was insanity; and the defendant's principal assignment of error is that the trial court erroneously instructed the jury on this issue.

It is asserted that the court committed reversible error in giving, at the State's request, the following instructions:

No. 17: "The Court instructs the jury that a safe and reasonable test in all cases of insanity is that whenever it appears from the evidence that at the time of doing the act charged the defendant was not of sound mind but affected with insanity and that such affliction was the efficient cause of the act, and that he would not have done the act but for that affliction, he ought to be acquitted. But the unsoundness of mind, or affliction of insanity, must be of such a degree as to create an uncontrollable impulse to do the act charged by overriding the reason and judgment and obliterating the sense of right or wrong as to the particular act done or depriving the accused of the power of choosing between right and wrong."

No. 18: "The Court instructs the jury that if from all the evidence in the case you believe beyond a reasonable doubt that the defendant committed the crime of which he is accused, in manner and form as charged in the indictment, and at the time of the commission of such crime the defendant knew that it was wrong to commit such crime and was mentally capable of choosing either to do or not to do the act or acts constituting such crime and of governing his conduct in accordance with such choice, then it is your duty under the law to find him guilty, even though you should believe from the evidence that at the time of

the commission of the crime he was not entirely and perfectly sane."

No. 27: "The court instructs the jury, that if you believe from the evidence beyond a reasonable doubt that at the time of committing the alleged crime (if you believe from the evidence beyond a reasonable doubt that he did commit such crime) the defendant was able to distinguish right from wrong as to the particular act done and was able to choose between them and was able to control his action accordingly, then you can not acquit him on the ground of insanity."

These instructions are admittedly in accord with previous expressions of this court, but the defendant argues that they are unsound and should be abandoned. He maintains that in lieu thereof an instruction similar to the following (which was refused by the trial court) should be given:

No. 31: "The Court instructs the jury that, unless you believe beyond a reasonable doubt that Richard Daniel Carpenter was not suffering from a diseased or defective mental condition, or, that if he is so afflicted, that the criminal act charged was not the product of such diseased or defective mental condition, you must find the accused not guilty by reason of insanity.

"Thus, your task would not be completed upon finding, if you did find, that Richard Daniel Carpenter suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal relation between such mental abnormality and the act. These questions must be determined by you from the facts which you find to be fairly deducible from the testimony and the evidence in this case, keeping in mind that the defense is not required to prove insanity beyond a reasonable doubt, but, rather, need only establish by the evidence a reasonable doubt of the sanity of Richard Daniel Carpenter."

The defendant relies mainly upon *Durham* v. *United States,* 214 F.2d 862, which in turn, was influenced by *State* v. *Pike,* 49 N.H. 399. He insists that the instructions given in this case are at variance with "scientific realities" and that our law in this regard is in need of revision in the manner indicated.

The relationship of mental illness to criminal responsibility is, of course, an age-old problem. (See, generally, Hall, General Principles of Criminal Law, chap. 14, pp. 477-538.) It is extremely difficult to formulate principles delineating when and to what extent a mental disease or defect so reduces the voluntariness of an accused's act as to exclude responsibility for that act, and even more difficult to apply those principles in concrete cases. Yet it is the task of the judiciary to do so, and every reasonable effort must be made to the end that a just result is obtained.

The leading common-law decision is *McNaghten's case,* 8 Eng. Rep. 718 (1843), and with subsequent modifications the rules there enunciated make up the bulk of the law on this subject, both in Great Britain and the United States Of these rules, the most important was that which has become known as the "right and wrong test." It follows: "* * * to establish a defense on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; or, if he did know it, that he did not know he was doing what was wrong."

Objections to this test were voiced early and are heard to this day. The criticism has not altered in any essential respect, it being charged that while the rule takes account of the impairment of cognition or intellect it ignores impairment of volitional capacity or will. It is said that the rule fails to recognize the situation where one knows it is wrong

to do a certain act but because of mental illness is not able to control his actions accordingly.

While the McNaghten Rules have been interpreted in various ways and are not without their defenders (see, *e.g.,* Hall, In Defense of the McNaghten Rules, 42 A.B.A.J. 917,) such criticism is wide of the mark in the instant case, for courts in this State do not rely solely upon the "right and wrong test." "The mere ability to distinguish right from wrong is not the correct test * * * the accused must also be mentally capable of choosing either to do or not do the act and of governing his conduct in accordance with such choice." (*People* v. *Lowhone,* 292 Ill. 32, 48.) Thus, as will be noted from a reading of the instructions in this case, there is no responsibility for one even if he knows the difference between right and wrong if he is not "capable of choosing either to do or not to do the act or acts constituting such crime *and of governing his conduct in accordance with such choice."* (Instruction No. 18.) And in instruction No. 27 the jury is told that the defendant is responsible if he "was able to distinguish right from wrong as to the particular act done and was able to choose between them *and was able to control his action accordingly* * * *."* These are similar to the form tentatively recommended by the American Law Institute in its draft of a Model Penal Code: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." The American Law Institute, Model Penal Code, Tentative Draft, section 4.01.

This common thread of excusing conduct over which the accused has no control is also present in the so-called "irresistible impulse test" which Illinois and an apparent minority of other jurisdictions expressly recognize. (See

instruction No. 17 above.) But here again the defendant charges that there is undue recognition of the intellectual faculty. However, a reading of the instruction discloses that this is not true. For under this instruction there is no criminal responsibility if the "unsoundness of mind" or "affliction of insanity" was of such a degree "as to create an uncontrollable impulse to do the act charged by overriding the reason and judgment and obliterating the sense of right or wrong as to the particular act done *or depriving the accused of the power of choosing between right and wrong*." In short, the three instructions given in this case are not subject to the criticism lodged against them.

As noted, the defendant not only maintains that the given instructions were fatally defective, but that the instruction which he tendered, adapted from *Durham* v. *United States*, 214 F.2d 862, should have been given instead.

This brings us to a consideration of the *Durham case*, which was decided in 1954 by the Court of Appeals for the District of Columbia. In that case the court considered this general problem at length and concluded that the "existing tests of criminal responsibility" in that jurisdiction were "obsolete and should be superseded." In its opinion a sound test, cast in the form of a jury instruction, could be stated in substantially the following language:

"If you the jury believe beyond a reasonable doubt that the accused was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental abnormality, you may find him guilty. Unless you believe beyond a reasonable doubt either that he [the defendant] was not suffering from a diseased or

defective mental condition, or that the act was not the product of such abnormality, you must find the accused not guilty by reason of insanity. Thus your task would not be completed upon finding, if you did find, that the accused suffered from a mental disease or defect. He would still be responsible for his unlawful act if there was no causal connection between such mental abormality and the act. These questions must be determined by you from facts which you find to be fairly deducible from the testimony and the evidence in this case."

The *Durham case* aroused a great deal of interest and has been commented upon extensively. (See, *e.g., 22* U. of Chicago L. Rev. 317, an 86-page "critique" of the case.) For able presentations of opposing views, see: Soboloff, Insanity and the Criminal Law: From McNaghton to Durham, and Beyond, 41 A.B.A.J. 793; Hall, Repsonsibility and Law: In Defense of the McNaghten Rules, 42 A.B.A.J. 917.

While we do not presume to say that the instructions given in this case should be considered the final word, we do not believe the *Durham* type instruction would be an improvement.

From the substantive standpoint, there does not seem to be any significant difference, especially as the instructions would be understood by the ordinary jury. Both tests recognize that criminal responsibility must take account of impairment of the will, as well as impairment of the intellect. And, if anything, the given instructions are the more explicit, articulate and useful.

In the refused instruction, the words "disease," "defect," and "product" are left undefined, and on the whole, the instruction is vague and ambiguous. Observing this, one writer concluded that *"Durham* then puts forth, in my opinion, a legal principle beclouded by a central ambiguity, both unexplained and unsupported by its basic rationale."

(Wechsler, The Criteria of Criminal Responsibility, 22 U. of Chicago L. Rev., 367, 373.) The need in this area is for more clarification, and the *Durham* instruction does not supply it. Justice Learned Hand put it this way: "I have read the opinion that you mention, and perhaps it is all that can be said; but, frankly, it did not seem to me to give us any guidance that perceptibly would help." Quoted in 22 U. of Chicago L. Rev. 319.

We conclude, therefore, that the court did not commit error in its ruling on the instructions.

The defendant's next contention is that the State failed to establish he was sane at the time of the alleged crime.

To adequately summarize the evidence from which the jury concluded that the defendant was sane when he committed the alleged murder, it is necessary to trace briefly the chain of events (all uncontradicted) which make up the State's case against him.

The first link is the robbery of a tavern on April 1, 1955. As related by an off-duty police officer who was present: "A man [identified as the defendant] walked in displaying a gun, demanded the contents of the register and climbed to a standing position on the bar with one foot on a barstool. I jumped off my stool, drew my revolver and said, 'Drop your gun.' * * * He said 'Put your gun on the bar or I'll kill the bartender.' We argued and he threatened for about five minutes and I slid my gun to him. He put it in his belt. * * * He then demanded and received the money in the cash register and fled."

Officers John Bosquette and William Murphy were assigned to investigate this robbery, and based on descriptions given and studies made of police records, etc., they concluded that the defendant had done it.

A few months later, on August 15, 1955, officer Murphy caught up with the defendant near a Chicago subway sta-

tion, but was not able to capture him. Rather, the defendant on this occasion shot and killed the officer, offering no excuse therefor other than a claim of insanity. The gun used in the slaying was the one taken in the robbery.

After the defendant shot officer Murphy, he ran to where one Clarence A. Koerper was sitting in a parked automobile. At gun point, he ordered Koerper to open the car door and start driving, saying "I just shot a cop and I would just as soon shoot you." Koerper protested that he was an old man, and the defendant assured him that he would not be hurt if he did as he was told. "He told me to turn left on Wabash if a left turn was permitted. As we moved North on Wabash, he cautioned me to smile and pretend all was well if anyone approached. He said he would shoot if a policeman approached but he wouldn't hurt me. He directed me to drive slowly, evidently noticing that I was getting nervous. * * * As we approached Dearborn he told me to let him out there and he said, 'Don't start anything, if you do, I'll get you even if I have to run after you.' "

An intensive search was made for the defendant, and he was spotted in a movie theatre by Clarence Kerr, an off-duty police officer. This was about 9:50 P.M. on August 17, 1955. Officer Kerr said he went to where the defendant was sitting, touched his shoulder, showed him his star, and told him he was a police officer. "He straightened up in his seat. He looked at me. He didn't say anything. I asked him what he was doing. He said he had had a couple of beers and was sleeping it off. I told him I wanted to talk to him in the lobby. He said, 'Why?' I told him, 'You know why.' I said, 'Murphy.' He said all right and started to put his hands in his lap. I grabbed his arm and pulled it way from his body. He asked me if he should put his hands in the air, and I told him no, just keep them away from his person. I told him we were going into the

lobby and he should come with me. I stood up and backed away from him to the aisles. As he started to get up, he stumbled. His hands were away from his body and he stumbled and he reached the gun in his lap. He came up firing. I was struck in the chest. He fired three times from that spot. I was hit by the first bullet, and then I started firing. I think I wounded him."

Afterward, the defendant ran from the theatre to an apartment building nearby and forced his way into the home of Mr. and Mrs. Leonard Powell, where he remained until his capture by the police the following evening.

Powell described how the defendant came to the door, gun in hand, and told him to open the door. "He told me to back off and sit down. He sat down in the chair in front of us. My wife was there. * * * He sat down and applied a tourniquet to his leg. His right pant's leg was covered with blood. He asked for hot water and bandages, or cloths, so he could wrap his wound. He slit his trousers all the way up. I noticed on his right leg he had a bullet wound. He put a bandage down there and kept holding the gun at us and using his right hand to pull the tourniquet up. He asked us to turn the television on to see if there was any news. There was a little bit on about the shooting in the theatre. He said they were after him, they sure had a lot of police looking for him. After that, we just looked at television for awhile. Then he asked for some milk. My wife brought him some milk, and he walked directly in back of her. When he came back he told us to sit down again. We looked at regular movies. We just sat around there and more or less watched television. After we turned the television off, we were talking and he said he shot another policeman in the subway. He didn't give the name or where it happened. We turned off television about one or one-thirty. He was still nursing his wound. He also was discussing his home life, things that he had done

brought shame to his parents and his sister. I did not sleep that night. I sat on the chair opposite him and my wife sat on another chair. He had the gun in his hand all the time."

Mrs. Powell summarized the defendant's activities the following day: "In the morning he told my husband to go to work as usual and he told my husband that if he didn't let the police know, my children and I would be safe. * * * There was nothing more said between Carpenter and me while my husband was at work. He just looked out the window through the blinds, which were pulled down. He asked me if he could use my husband's shaving equipment. I told him yes and he shaved. * * * Carpenter was still there when my husband returned about 6:00 o'clock in the evening. I served my husband his supper and took some supper to Carpenter. He just took a little bit. I observed that he was shot in the leg. He promised he would leave our home that evening around 9:00 o'clock, when it got dark."

Powell managed to place a call to the police, who came and took the defendant into custody, the surrender being made without a struggle.

Mr. and Mrs. Powell, as well as C. A. Koerper, each gave an opinion (by way of stipulation) that the defendant knew the difference between right and wrong and was possessed of the power to choose between right and wrong and govern his choice accordingly.

In addition, the State called Edward Laxner, a friend of the defendant who had been with him in school at Lisle, Illinois, during 1940 and had talked with him several times since, the last being in July, 1955. He gave as his opinion that the defendant knew the difference between right and wrong and had the power to govern his choice accordingly. At the times he conversed with the defendant, he said the latter appeared to be normal in every way.

To support a claim of insanity, the defendant relies upon the testimony of his uncle and portions of a psychiatrist's testimony.

The uncle told of the defendant's life from birth in 1930 to a point two years prior to the slaying of officer Murphy. He said the defendant's mother, known in the neighborhood as "Crazy Mary," was mentally abnormal and alternately spoiled and rejected her son. The defendant, in retaliation against his mother's rejection, "drove nails throughout the place" and "would go out in the street and smash windows in the house." This was when he was about seven years old. When ten or eleven he was sent by juvenile authorities to a school in Lisle, "but they couldn't do anything with him, so he was sent home." He did graduate from grade school, but never attended high school and has never worked at any one job for over a week.

The witness told of seeing the defendant go into "violent rages." "It got to the point where we would just leave him alone. I have seen him smash things many, many times."

In 1948, the defendant enlisted in the Army, but did not like it. He went A.W.O.L. and was later dishonorably discharged.

In the opinion of this witness, the defendant never knew the difference between right and wrong and never had the ability to choose between right and wrong and govern his conduct accordingly.

The psychiatrist, Dr. William H. Haines, Director of the Behavior Clinic of the Criminal Court of Cook County, saw the defendant five or six times. "A series of questions and answers were given him," and "an attempt was made to perform a psychological examination but he refused to cooperate." Dr. Haines concluded that the defendant "was classified as a character disorder." He said "character disorder" has been variously described as "psychopathic personality, sociopath, moral insanity and various other terms,"

but differed essentially from a "psychoneurotic" and a "psychotic." The nearest he came to a definition of "psychopathic personality" was the following: "Well, the psychopathic personality is a group of individuals who do not adhere to social and moral customs, and that group includes the pathological liars, the prostitutes, the criminals, the drug addicts, the alcoholics, the check writers and the individuals who are not psychotic, not neurotic, not feeble-minded, not organic brain diseases but are deviated from normally accepted behavior. It's a waste basket classification." Additionally, he agreed, in response to a question put by defense counsel, that a psychopathic personality could rightly be described as a person whose "unconscious impulses obtain a sort of fullfillment, in another matter, by a pattern of objective pathologic behavior, in which association apparently purposeless and sometimes self-defeating and anti-social acts are carried out persistently, despite penalties, and in the absence of adequate conscious incentives."

In response to defense counsel's hypothetical question, incorporating some of the facts adduced at the trial, Dr. Haines said that the slaying of the police officer by the hypothetical person "might or could have been" a product of a mental disease or disorder. However, when the prosecutor detailed additional facts, the doctor stated that in his opinion the hypothetical person knew the difference between right and wrong, had the power to choose between right and wrong and to govern his choice accordingly. Moreover, he said that on the basis of his examinations he was of the opinion that the defendant Carpenter "knew the difference between right and wrong and had the power of choice."

On this record, it cannot reasonably be said that the jury's determination (that the defendant possessed sufficient mental capacity to be held criminally responsible) was not supported by sufficient evidence. For the witness who observed him immediately after the shooting, and those who

were with him for an extended period prior to his capture three days later, all agreed that he was sane, in the sense that he knew the difference between right and wrong, and had the power to choose between right and wrong and to govern his conduct accordingly. And more, they relate facts (all uncontradicted) which support their opinions. For example, Koerper tells how the defendant commandeered his car, giving him directions as to where to go, how to drive, etc. "He told me to turn left on Wabash if a left turn was permitted * * * he cautioned me to smile and pretend all was well if anyone approached * * * he directed me to drive slowly * * * he said he would shoot if a policeman approached but he wouldn't hurt me." These would seem to be the actions of one who both knows what he is doing and is able to exercise control over himself. Similarly, Mr. and Mrs. Leonard Powell, at whose home the defendant hid out, relate incidents which portray him as an alert, purposeful, self-controlled individual. A like conclusion can be drawn from the accounts of the defendant's conduct during the tavern robbery and the theatre gun fight.

Moreover, there is nothing in the medical testimony to detract from this conclusion. Dr. Haines stated that on the basis of his examination, he believed the defendant "knew the difference between right and wrong and had the power of choice." And while in response to the hypothetical question he replied that the slaying "might or could have been" a product of a mental disease or disorder, (he also said it might not have been,) when additional facts of record were added to the question he stated categorically that in his opinion the hypothetical person knew the difference between right and wrong and had the power of choice.

It is true the doctor's diagnosis was that the defendant had a "character disorder." But this loses most of its significance in the light of his definition of what those terms mean and in view of his opinion that the condition did

not deprive the defendant of the ability to distinguish right and wrong and control his conduct accordingly. And the testimony of the defendant's uncle, while admissible and properly to be taken account of by the jury, was certainly not sufficient to require a finding of mental incapacity at the time of the alleged crime. The uncle's observations were limited mainly to the defendant's early life (up to a point two years prior to the murder), and are not of such a character as to persuade us that the defendant's mental capacity was substantially impaired on August 15, 1955. Viewed in its entirety, we cannot say the evidence is sufficient to require the defendant's discharge.

The defendant next urges that the trial court improperly limited the redirect examination of Dr. Haines in a certain particular.

On his cross-examination of the doctor, the prosecutor elicited from him, without objection, that in his capacity as Director of the Behavior Clinic he had examined approximately 500 persons, of whom about one-half were afflicted with character disorders. The defense, on redirect examination, asked him how many persons were indicted and charged with crime in the criminal court of Cook County during the same period. The objection of the prosecution to this question was sustained, and the defense made an offer of proof that the answer would be that upwards of 2500 persons were indicted and tried in the criminal court of Cook County during that time.

The doctor, called by defendant, was questioned at length by both sides, and it is obvious that each elicited from him all they cared to regarding his opinion of the defendant's mental capacity and the factors upon which he based his opinion. This matter complained of, forming but a minute part of the doctor's evidence, was of doubtful admissibility since it is agreed that all defendants do not go before the Behavior Clinic for an examination and only after a requested examination would the doctor know of

those indicted in the criminal court. And even if we were to agree that the court should have permitted him to answer the question, the refusal in this instance could not have caused any substantial prejudice, reasonably have affected the result, or justify a reversal of the conviction.

Finally, the defendant asserts that he was deprived of a fair trial by reason of a certain story published in a Chicago newspaper during the course of the trial.

It appears that after a day of *voir dire* examination, a panel of four jurors had been accepted. The judge then told the defendant that he was entitled to have the jury locked up during the pendency of the trial, but the defendant, through his counsel, moved the court to permit the jury to disperse for the evening. When trial resumed the following morning, counsel complained that a certain article had appeared in the preceding day's editions of a Chicago newspaper, reporting that Dr. William H. Haines of the Behavior Clinic submitted his finding that the defendant was legally sane. He added that it had been brought to his attention that a number of TV stations also carried that report, and asked the court to declare a mistrial.

In refusing to declare a mistrial, the court said: "I will have to agree with you that it is becoming increasingly difficult to handle a trial such as this with publicity through the mediums of radio, television and newspapers, but at this particular stage of the trial, I don't think any prejudice has entered into the minds of any of the jurors. And at this period of the trial, you will have an opportunity to find that out. The State has agreed that you can re-open the first panel of four and question those that have already been sworn."

The first panel was then re-opened and defense counsel made further inquiry of them, after which a statement was entered of record that "they indicated that they heard or read nothing to influence their verdict."

We do not believe the trial court abused its discretion in declining to stop the trial. The panel was re-opened, and they were questioned further by defense counsel, but indicated that they had heard or read nothing to influence their verdict. There is nothing to show that the jurors were improperly influenced or prejudiced or that they otherwise were not fair and impartial jurors.

The jury has spoken, their verdict is supported by the evidence, the defendant was accorded a fair trial free of prejudicial error, and it is our duty under the law to affirm the judgment of conviction.

The clerk of this court is directed to enter an order fixing Friday, the 7th day of June, 1957, as the date on which the original sentence entered in the criminal court of Cook County shall be executed. A certified copy of this order shall be furnished by the clerk of this court to the sheriff of Cook County.

*Judgment affirmed.*