**People of the State of Illinois, Plaintiff-Appellee, v. Charles W. Haun, Defendant-Appellant.**

**Gen. No. 10,623.**

Fourth District.

June 6, 1966.

SMITH, J., dissenting.

Carl O. Hoffee, of Springfield, for appellant.

Raymond L. Terrell, State's Attorney, of Springfield (Richard A. Hollis, First Assistant State's Attorney, and

■■■■■■■

Laurin A. Wollan, Jr., Assistant State's Attorney of counsel), for appellee.

CRAVEN, J.

The defendant-appellant was convicted of attempted murder and aggravated battery, by a jury, and sentenced to a term of a minimum of eight years and a maximum of fourteen years in the penitentiary. This appeal is from that judgment and sentence. In his appeal the defendant alleges seven separate errors. The mixed issues of the defendant's sanity and waiver of counsel, in light of the facts disclosed in this record, are, however, the controlling questions in this appeal.

The facts of this case are somewhat unique. The defendant was indigent at the time the court appointed his first legal counsel, the public defender. Thereafter, the court dismissed the public defender at the defendant's request. The defendant, at that time, stated he wished to retain private counsel. The defendant appeared at a later date and informed the court he did not have the funds to employ private counsel and the court then appointed an attorney of the Sangamon County Bar.

The trial began with the second appointed counsel representing the defendant. In the opening statement for the defendant, it was stated that the defense to the charges presented would be insanity.

Marilyn Haun, the defendant's 26-year-old wife, was the victim of the alleged offenses and appeared as a witness for the People. Mrs. Haun testified that she and her husband were at Reverend Harold Elijah Harrison's home, in Springfield, in a meeting, attempting to resolve their marital difficulties. She stated that, after some time, they left the Harrison home together and both walked to a car parked in front of the house; then the witness stated the defendant struck her, that she felt a cutting, although she did not see a knife. The witness

stated she ran and called for help from Reverend and Mrs. Harrison who, together with a third woman, helped the witness to the hospital. She testified she had thirteen separate wounds. She was pregnant at the time of the attack.

After a brief cross-examination, the defendant announced to the court, outside the presence of the jury, that he wished to excuse counsel because of the disagreement with his attorney's method of cross-examination. The court admonished the defendant that he must represent himself or hire a private attorney if he again dismissed counsel. The court further warned the defendant that he would not interrupt the progress of the trial. After the defendant indicated that he intended to proceed with the defense of his case without the services of counsel, the court then directed counsel to assist the defendant through his presence and advice. Thereafter the defendant assumed the trial of his own case.

Marilyn Haun was then recalled and the defendant asked her about certain conversations occurring on July 26, 1963. Upon objection, the court limited the cross-examination to the date of December 23, 1963, the date of the offense, the only date testifed to on direct examination.

The People then called Reverend Harold Elijah Harrison, who testified that the defendant and his wife were at his home on the night of December 23, 1963, attempting to effect a reconciliation. He stated that after hearing screams he saw the defendant approach him, without speaking, and hand him a paring knife which belonged to Reverend Harrison and came from his kitchen. On cross-examination the court, after objection of the state's attorney, narrowly limited the scope of inquiry to the night of December 23. The court further excluded testimony of the emotional "state or condition" of Charles Haun when he came to Reverend

Harrison's home at an earlier date as beyond the scope of direct examination.

Further testimony for the State established that the defendant admitted the stabbing on several occasions and that the victim suffered twelve separate wounds.

The defendant then recalled his wife as a defense witness and attempted to show that when he met his wife in July of 1963, she was pregnant by another man. The court, upon objection, refused to allow the testimony. It was held to be immaterial and too remote.

After conferring with his counsel-advisor and after advice from the court that he had a record of prior convictions, the defendant took the stand in his own behalf. He testified, in narrative form, that he had been in a mental institution for eighteen months to two years, at Warren State Hospital, in Pennsylvania. The specific date was not established. Further, he had pleaded guilty to two offenses in the State of Pennsylvania. He came to Decatur to start a new life, obtained a job, and met and married his wife. He further stated that his wife was pregnant by another man before they were married. This portion of the testimony was stricken and the jurors instructed to disregard it on motion by the People. The defendant related that he and his wife lived together and were buying a home when his wife started "running around" with the man who fathered her as yet unborn child. He testified that he made several attempts to convince her to return to him but that she continued to see the other man.

On the night of the stabbing, the defendant claimed he was attacked by his wife with a knife and that he then disarmed her. Thereafter he testified:

> " 'At that time, and it's the God's truth, a sharp pain run across my head right here, just like water, and hot water, it get hot and it get cold, run down the side of my face and, like a lot of needles,

ever'thing all runnin' down the side of my neck all the way down, and my body started vibratin', and I struck at her, I remember strikin' at her, but how many times, I don't know, because I don't remember how many times I hit her, all I remember was when Rev. Harrison called me.' "

On cross-examination, the state's attorney impeached the defendant with a prior statement wherein he admitted to the police that he took the knife from his own pocket.

The defendant then recalled Reverend Harrison who testified that the defendant appeared normal until the name of his wife's lover was mentioned and that then a drastic change occurred. The witness then made several remarks and observations concerning the defendant's mental condition and nervous state. This testimony, too, was stricken. At all of the above proceedings, counsel was present but did not participate other than to confer privately with the defendant and the court.

■ The defendant raises a question as to the validity of the indictment for failing to comply with c 38, Ill Rev Stats 1963, § 111–3, for failing to set forth time and place of the offense "as definitely as can be done." This issue has been resolved by our Supreme Court in People v. Blanchett, 33 Ill2d 572, 212 NE2d 97 (1965), wherein it reversed a decision of this Court entertaining the views here advocated by the defendant. (55 Ill App2d 141, 204 NE2d 173 (1965).)

The basic issue in this case, from the standpoint of substantial justice, is the issue of insanity at the time of the offense. The concept of legal insanity is probably one of the most controversial areas in the law. It is an area in which jurists, advocates and laymen are asked to define "conduct" within a statutory rule that is difficult if not incomprehensible to the most experienced

267

forensic psychiatrist. Extreme caution must guide the administration of our system of criminal justice where, as here, we are dealing with a person with a history of mental illness.

The court, upon objection by the State, excluded testimony by the defendant's wife as to her pregnant condition prior to their marriage. The defendant first attempted to cross-examine his wife after she testified as the State's complaining witness. This inquiry was ruled beyond the scope of the direct examination. Later the defendant called his wife as a defense witness and such testimony was excluded as irrelevant. The defendant's informal offer showed that when he met his wife she was pregnant by another man and that, after they married, they experienced considerable difficulty over this situation and the other man, which affected the defendant's state of mind. The court required that the defendant confine his inquiry to the events of December 23, 1963, the date of the stabbing. Likewise, defendant's testimony was limited to the date of December 23.

The inquiry was not whether the defendant committed the stabbing, but whether he was insane at the time of the act. To determine insanity, you cannot take an isolated cross section of a single series of acts and myopically examine it within the narrow confines of the date set forth in a formal charge. In order to make a proper determination, there must be more than a cross section; we must examine the person, his history, his relationship with the victim, prior mental illnesses and other intervening factors of causation. 20 Am Jur Evidence, p 324; Committee Comments, SHA ch 38, sec 6-2(b). Great latitude is normally afforded the defendant in the admission of evidence as to mental condition. (26 Am Jur Homicide, p 385.)

This is especially applicable here, where the defendant represented himself. Illinois has never adopted a restrictive evidentiary rule with respect to the

scope of inquiry where mental state or condition is in issue. People v. Moor, 355 Ill 393, 397, 189 NE 318 (1934). People v. Carpenter, 11 Ill2d 60, 75, 142 NE 2d 11 (1957). We conclude that the exclusion of this evidence was prejudicial to the defendant.

■ The defendant objects that the court improperly instructed the jury on the issue of insanity. The state tendered an instruction to the effect that all persons are presumed sane until the contrary is shown. This instruction was given without objection. No instruction was given defining the legal test of insanity. Our Supreme Court has strongly criticized the use of a like instruction.

> "While the law presumes that all men are sane, in a criminal case, whenever there is evidence introduced tending to show that the accused was insane at the time of committing the act constituting the alleged crime, the burden then devolves upon the State, regardless of the presumption, to prove, beyond a reasonable doubt, by evidence, that at the time of the commission of such act the accused had sufficient mentality to distinguish between right and wrong as to that particular act, and that he was capable of exercising the power to choose between the right and the wrong, and if the evidence fails to show both such facts beyond a reasonable doubt it is the duty of the jury to acquit the defendant. (People v. Lowhone, 292 Ill 32 [126 NE 620].) An instruction to the jury as to what the presumption of law is, upon a question of disputed fact, is extremely likely to mislead the jury and should not be given. Guardian Mutual Life Ins. Co. v. Hogan, supra; [80 Ill 35]; Garrettson v. Pegg, 64 Ill 111." (People v. Cochran, 313 Ill 508, 524, 145 NE 207 (1924).)

Such an instruction has been declared to be error.

"This instruction is erroneous. The law does not presume every person accused of a crime to be sane until the contrary is shown. The only effect of the presumption of sanity is to require the introduction of evidence tending to prove insanity. When that is done the presumption no longer prevails. It does not continue until the contrary is shown. The question of sanity or insanity is then to be determined from the whole evidence, *without any reference to the presumption.* The rule as stated in the instruction in effect imposes the burden of proof on the defendant. It is not essential that insanity should be shown. All that is required of the defendant is evidence sufficient to raise a reasonable doubt of sanity. The presumption of sanity can not be considered by the jury in determining whether the defendant is sane or insane. Whenever evidence is introduced tending to show that the accused was insane at the time of committing the act charged as a crime, the burden devolves upon the State to prove beyond a reasonable doubt, regardless of the presumption, that at the time of the commission of the act the accused was sane. [Citing case.]"
. . . (People v. Saylor, 319 Ill 205, 211, 212, 149 NE 767 (1925)). (Emphasis added.)

The State argues that other later cases have held that there is a presumption of sanity. People v. Wagner, 390 Ill 384, 386, 61 NE2d 354 (1945). People v. Shroyer, 336 Ill 324, 326, 168 NE 336 (1929). People v. Haensel, 293 Ill 33, 37, 38, 127 NE 181 (1920). The question here is not the existence of such a presumption. We find that there is no reason to instruct as to a presumption where there is competent evidence to the contrary. Presumptions are legal fictions, the niceties of which are of little value to a lay jury in determining ultimate facts. See also People v. Bender, 20 Ill2d 45, 169 NE2d 328 (1960), as to pretrial sanity hearing.

270

In this case, the evidence on the question of insanity or the evidence thereof erroneously stricken by the trial court was sufficient to exclude consideration of any presumption of sanity. In that circumstance, there was no cause to instruct as to that legal fiction.

■ ■ Once the issue of insanity was raised and evidence introduced, the question of sanity or insanity was then to be determined from all the evidence in the case. The jury should be instructed as to what constitutes insanity under the law of Illinois and an instruction relating to a continuing presumption of sanity is error. See People v. Carpenter, 11 Ill2d 60, 142 NE2d 11 (1957); Committee Comments, SHA ch 38, sec 6–2.

In the delicate area of ascertaining criminal responsibility, the jury should not be left to speculate as to what constitutes a legal defense of insanity under our law. In determining criminal responsibility the jury was guided only by the improper instruction on the presumption of sanity. We cannot sustain a conviction in light of this combination of circumstances.

The defendant argues that the court should have required a hearing to determine competency to stand trial under ch 38, sec 104–2, Ill Rev Stats 1963. This issue need not be determined in view of our conclusion that the case must be remanded for a new trial. The issue of the defendant's competence to stand trial may appropriately then be determined if there is, in fact, cause, at that time, for such a determination. See Pate v. Robinson, 383 US 375, 15 L Ed2d 815, 86 S Ct 836.

The judgment of the circuit court of Sangamon County is reversed and this cause is remanded for a new trial.

Reversed and remanded for a new trial.

TRAPP, P. J., concurs.

271

SMITH, J., dissenting.

I do not believe that insanity is the basic issue in this case "from the standpoint of substantial justice," or for that matter from any standpoint. Neither do I understand its characterization as one of the "mixed issues," along with "waiver of counsel," when the latter is not even discussed, and only mentioned in passing as one of the "unique" facts. True, insanity was alluded to in defendant's opening statement, but the simple fact is that this issue was never developed and I am not persuaded in the least that the testimony so excluded was probative of this or any other developed issue. Counsel's assurance in opening statement that insanity would be the defense does not create the context for this testimony. The context can only be created by proof, probative of that issue, before the introduction of the evidence now ruled admissible can be permitted.

Let me make my meaning more precise. Standing alone, the excluded evidence was probative of nothing so far as this indictment is concerned. One can thumb the pertinent sections of the Annotated Code on Justifiable Use of Force: Exoneration, and not find a single annotation much less language which justifies or exonerates or excuses the stabbing of wives by husbands because they are pregnant by another—with or without knowledge at the time of marriage. It could become probative of the defense of insanity, but that issue must first be developed, that is, framed, before we can let happenstances such as this intrude on trials as we know them. Were it otherwise, the trial of criminal cases would soon become quagmires of collateral circumstances, remote incidents, and assorted trivia, with the central issues slipping out of sight into the ooze.

There are prescribed and readily available avenues by which this issue can be raised. Although it is not stated as such, I detect the majority looks askance at even the delimitation on cross-examination of the victim

272

when on the stand as a witness for the People. I need only say in passing, that the People are under no duty to negate in chief, the affirmative defense of insanity, and pari passu, the defendant is prohibited from injecting the issue on cross-examination, unless it does relate to direct.

No one would seriously resist the notion that if insanity is in issue, the ambit of inquiry broadens considerably, much as concentric circles radiate from a point where a pebble is dropped onto an otherwise placid pool. But as a precondition for such concentricity, there must be a pebble, or in our context, the establishment or development of such issue. This issue is not raised here, in my opinion, by this somewhat scandalous tidbit. Can it be seriously contended that such rises to the stature of framing the issue that on the night of December 23, defendant was not responsible for his conduct because he lacked "substantial capacity either to appreciate the criminality of his conduct" or to conform the same "to the requirements of law," "as a result of mental disease or mental defect?"

While I might concede that insanity is a controversial area, I think it an unwarranted expression, that "jurists, advocates and laymen are asked to define 'conduct' within a statutory rule that is difficult if not incomprehensible to the most experienced forensic psychiatrist." I do not believe this at all and while I would be the first to agree that extreme caution must guide the administration of public justice, I do not think caution dictates digressions of this sort, which can only result in wide misunderstanding and cause the sensible and judicious to grieve. Indeed, only recently the Court of Appeals for the Second Circuit, in adopting Section 4.01 of the Model Penal Code, almost identical to our "statutory rule," spoke of the same as, "permitting the utilization of meaningful psychiatric testimony"; "couched in sufficiently precise terms to provide the jury with a

workable standard," and that it was "comprehensible to laymen." United States v. Freeman, 357 F2d 606, 34 US Law Week 2478 (1966).

Had the issue of insanity been raised by the evidence, I would be the first to concur, that what otherwise might be considered remote or collateral, could become germane. Even then, I would be loath in most situations, to make the sweeping "determination" called for in the majority opinion, that "we must examine the person, his history, his relationship with the victim, prior mental illnesses, and other intervening factors of causation." This statement I consider fraught with the same dangers noted above, for it would seem to give an imprimatur that once somebody mentions insanity, the trial is open for an interminable excursion apropos of the "person," his "history," his "relationship with the victim," "prior mental illnesses," and "other intervening factors of causation," whatever that means. I can only assume that they all mean an open sesame for all sorts of irrelevancies and immaterialities and I am sure that they will be latched onto as such by the disingenuous, but ingenious. This, indubitably, is not going to improve the administration of public justice.

I think, too, that it is a mistake to say that "intervening factors of causation" must be examined before a "proper determination" can be made. Does this imply that the sources and causes of crime (imponderables though they be) are now germane in determining whether a crime has been committed? It, of course, can be pertinent, if causation can be equated with motive, but certainly not otherwise, because motive and causation, conceptually, are two different things. For a crime to exist, there must be a voluntary act coupled with the requisite state of mind, by which we mean that one can choose not to do something if he opts. Otherwise, the cause or source of criminal "conduct" while certainly of vast interest to all of us who are interested in the

progress of civilization, is of no consequence whatsoever in making a proper determination that a particular person committed a particular offense. At least on this side of the ocean we have rejected the notion of determinism in the ordering of man's affairs.

Of course, if there was no issue of insanity, as I have concluded, then the refusal of defendant's tendered instruction on this issue was quite proper. While it might seem, to be consistent, that I should now outlaw the giving of the People's instruction on the presumption, I can appreciate that the pretense of an issue of insanity could properly engender in the mind of the prosecution the apprehension that such pretense might be accepted as fact unless rebutted, or rather, neutralized. Thus, I think that the defendant opened the door to the giving of this instruction in his opening statement, which is not to say that I approve, simply that I don't think it was reversible error.

I do not wholly understand the digression that presumptions, while admittedly legal fictions, are of "little value to a lay jury." Without belaboring the point, I fail to see any "niceties" in, say, the presumption of innocence, nor do I think that presumptions generally, including the presumption of sanity, are of little value to a lay jury. Presumptions, in my opinion, to paraphrase Judge Prettyman, are something more than mere "pious platitudes recited to placate the shades of venerated legal ancients." See Billeci v. United States, 184 F2d 394.

As I would affirm the judgment, I therefore dissent.